**CENTRAL MAINE POWER
COMPANY et al.**

v.

**PUBLIC UTILITIES COMMISSION
et al.**

Supreme Judicial Court of Maine.

Argued March 7, 1980.

Decided May 30, 1980.

Pierce, Atwood, Scribner, Allen, Smith & Lancaster, Gerald M. Amero (orally), Charles Einsiedler, Jr., Portland, Seward B. Brewster, Augusta, for Central Maine Power Co.

Robert S. Briggs, Bangor, for Bangor Hydro-Electric Co.

Verrill & Dana, Roger A. Putnam, Portland, for Maine Public Service Co.

Joseph G. Donahue (orally), Horace S. Libby, Public Utilities Commission, Charles F. Dingman, David H. Moskovitz, Augusta, Paul A. Fritzsche (orally), Pine Tree Legal Assistance, Inc., Lewiston, Harvey Salgo, Boston, Mass., for Maine Committee for Utility Rate Reform.

Before WERNICK, GODFREY, NICHOLS, GLASSMAN and ROBERTS, JJ.

WERNICK, Justice.

Consolidated before us are appeals under 35 M.R.S.A. § 303 (Section 303 appeals) and a proceeding by "complaint" under 35 M.R.S.A. § 305 (Section 305 complaint) brought by Central Maine Power Company (Central Maine), Bangor Hydro-Electric Company (Bangor Hydro), and Maine Public Service Company (Maine Public Service) (hereinafter, collectively, "the utilities") seeking judicial review of December 28 and 31, 1979 orders of the Public Utilities Commission (the Commission).[1]

The Commission's December 28th order required the utilities to spread out by an additional five months the period within

---

1. We have jurisdiction as to the Section 303 appeals since the orders of the Commission appealed from are final orders within the meaning of Section 303, as further clarified in *Mechanic Falls Water Co. v. Public Utilities Commission*, Me., 381 A.2d 1080, 1087 (1977).

Even were the Commission's orders interlocutory, rather than final, that would not in itself be determinative of our jurisdiction of the Section 305 complaint. The finality of an order is not a prerequisite for judicial review pursuant to Section 305. *See Lewiston, Greene and Monmouth Telephone Company v. New England Telephone and Telegraph Co.*, Me., 299 A.2d 895, 902–03 (1973).

which they could charge for rate "adjustments" arising from increases in their fuel costs for supplying electricity, the increases having been caused by the shutdown of the Maine Yankee Nuclear Generating Plant (Maine Yankee) from March 15 to June 9, 1979. The Commission's December 31st order set out the formula by which collection would proceed during the extended period.

The utilities contend that the Commission violated due process of law, exceeded its statutory authority, and committed other errors of law not only in extending, but also by the particular manner it acted to extend, the period within which the utilities could charge for the adjustments as to their increased fuel costs.

We deny the Section 303 appeals. On the Section 305 complaint we order entry of judgment for the defendants.

*1. Facts, Procedural History, and Issues.*

By complaints filed on March 22, April 3, and April 9, 1979, pursuant to 35 M.R.S.A. § 291,[2] the Maine Committee for Utility Rate Reform (the "Maine Committee") and other named individuals challenged the "justness and reasonableness" of passing through to the ratepayers adjustments reflecting the increased fuel costs the utilities sustained in supplying electricity because Maine Yankee had been shut down on March 15, 1979 for a period then undetermined but which turned out to be until June 9, 1979. The Nuclear Regulatory Commission (NRC) had ordered the shut-

down pending its re-evaluation of whether a particular safety system within the Maine Yankee plant would withstand earthquakes of calculated intensities. Doubts as to the adequacy of the system were prompted by the NRC's reconsideration of the appropriateness of various computer analyses used in designing the system's earthquake tolerance.

The (Maine) Commission issued a Notice of Investigation on April 13, 1979, announcing its intention to conduct a formal investigation of the complaints filed by the Maine Committee and to consolidate with that investigation its own investigation of the matter. The subjects to be investigated were: (1) the reasonableness of passing on to ratepayers charges regarding the fuel adjustments occasioned by Maine Yankee's shutdown; (2) the reasonableness of the manner in which costs associated with the shutdown should be borne by the ratepayers; and (3) the advisability of establishing temporary rates pursuant to 35 M.R.S.A. § 311.

At the time Maine Yankee was shut down the utilities' schedules of permanent rates included a "fuel adjustment" provision, so-called, pursuant to 35 M.R.S.A. § 131,[3] and approved by the Commission. Its purpose and function may be explained, generally, as follows. Like other public utilities, electric utilities are permitted to charge, for the services they provide, a base rate the justness and reasonableness of

---

**2.** 35 M.R.S.A. § 291 (1978) provides:

"Upon written complaint made against any public utility by 10 persons, firms, corporations or associations aggrieved, that any of the rates, tolls, charges or schedules or any joint rate or rates of any public utility are in any respect unreasonable or unjustly discriminatory, or that any regulation, measurement, practice or act of said public utility is in any respect unreasonable, insufficient or unjustly discriminatory, or that any service is inadequate or cannot be obtained, the commission, being satisfied that the petitioners are responsible and that a hearing is expedient, shall proceed with or without notice to make an investigation thereof. No order affecting said rates, tolls, charges, schedules, regulations, measurements, practices or acts

complained of shall be entered by the commission without a formal public hearing."

**3.** 35 M.R.S.A. § 131(1) (1978) provides:

"*1. Billing.* The cost of any and all fuel used by an electric utility in generating or supplying electricity to a customer shall be included in the itemized fuel charge and shall be billed at a single uniform rate per kilowatt-hour used by a customer. Such fuel charge shall be the fuel rate multiplied by the number of kilowatt-hours used by a customer. The fuel rate shall be uniform for all customers of any electric company, and that rate shall be calculated by dividing the total cost of fuel used in generating or supplying electricity which is applicable to a billing period by the total number of kilowatt-hours used by all customers."

which is assessed by reference to a "test year." Costs of fuel are an important factor in the determination of the rates of electric utilities. Since fuel costs have a tendency to fluctuate rather than to be relatively stable, the "test year" methodology for projecting fuel costs over the indefinite future period for which a permanent rate is to be effective is likely to be an inadequate gauge of justness and reasonableness. It would therefore become necessary for the Commission to conduct frequent reviews of the justness and reasonableness of the permanent rates of electric utilities in light of fuel cost fluctuations. To avoid this, the legislature, in Section 131, prescribed a methodology by which adjustments in the permanent rates of electric utilities can be achieved in a routinely regularized manner to accommodate to the fluctuating costs of the fuel used in generating and supplying electricity. The exact nature of this adjustment methodology is a key point in our decision and will be discussed more fully in the course of this opinion.

During the period of the shutdown of Maine Yankee the fuel adjustment clause in the filed rate schedules of the utilities provided that the adjustments regarding fuel costs be based on the use of a "three months rolling average" (which we shall also discuss in more detail later in the opinion). Had the Commission not taken the further actions here at issue, under the three months rolling average provision in their tariffs the utilities would have collected by the end of the summer of 1979 the entire amount of fuel adjustments reflecting the increased fuel costs arising from the shutdown of Maine Yankee. Confronting this prospect, the Commission, on April 19, 1979, scheduled a pre-hearing conference for May 4 and 5, 1979 to consider, among other matters, the Maine Committee's re-

quest for relief (one of several made by it) that the Commission investigate the justness and reasonableness of passing through to the ratepayers any, some, or all of the fuel cost adjustments of the utilities attributable to the shutdown of Maine Yankee.

As a result of the pre-hearing conference of May 4 and 5, at which evidence was presented and argument heard on issues of preliminary relief, the Commission ruled that:

"[o]n the evidence presented to the Commission on May 4 and May 5, the Commission finds that under currently effective fuel adjustment tariffs of the three relevant utilities, ratepayers would be subject to substantial injuries to their interests in the form of significantly increased electric bills resulting from the unrestricted pass-through of fuel replacement costs due to the shutdown of the Maine Yankee Atomic Power Station."

So finding, and purporting to act pursuant to powers conferred by 35 M.R.S.A. § 311,[4] the Commission ordered that the tariffs of the utilities be altered to provide for charging over a twelve month period, ending July 31, 1980, the adjustments as to the energy rendered unavailable to the utilities by the shutdown of Maine Yankee. The utilities did not seek judicial review of this May 5th order.

Subsequently, the Maine Committee twice moved to amend the May 5th order for enlargement of the collection period, to avoid what the Maine Committee perceived to be the strong likelihood that the ratepayers would have paid a substantial portion, if not all, of the charges for the fuel adjustments before the time of a Commission decision in its underlying investigation.

In regard to the first of the Committee's two motions the Commission held a pre-

4. 35 M.R.S.A. § 311 (1978) provides:

"Whenever the commission shall deem it necessary in order to prevent injury to the business of any public utility or to the interest of the people, or in case of any emergency which the commission may adjudge to exist, it shall have power, temporarily, to alter, amend or, with the consent of the public utility concerned, suspend any existing rates, schedules or orders relating to or affecting any public utility. Such rates so made by the commission shall apply to one or more of the public utilities in this State or to any portion thereof as may be directed by the commission, and shall take effect at such time and remain in force for such length of time as may be prescribed by the commission."

▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

hearing conference, on September 17, 1979, at which no new evidence was presented. On November 2, 1979, the Commission denied this first motion. On December 3, 1979 the Commission commenced a prehearing conference directed to the Committee's second motion to amend the May 5th order. Incident to this conference, the Commission, on December 10, 1979, received additional evidence presented by the Hearing Examiner. This evidence was in the form of an exhibit showing the total cost to the utilities of their purchase of electric energy to replace that lost when Maine Yankee was shut down, the percentage reflected in the billings as of December 31, 1979, and the remaining percentage yet to be billed.[5]

On the basis of that evidence supplementing the evidence of record by virtue of the May proceedings, and of the schedule the Commission had recently fixed for the hearings in the underlying investigation (the schedule projecting a Commission decision no earlier than mid-April 1980), the Commission issued its December 28, 1979 order extending the period for the collection of fuel cost adjustments another five months: from its previous termination date of July 31, 1980 to a new termination date of December 31, 1980. In making this order, the Commission again purported to act pursuant to Section 311, having concluded that the additional extension of time was "necessary in order to prevent injury to the interest of the people." In its Supplemental Order of December 31, 1979, the Commission set forth the formula for the billing by which the utilities would collect the fuel cost adjustments.

Seeking judicial review of these two December 1979 orders of the Commission, the utilities filed a Section 305 complaint in this Court alleging that the Commission's action involved errors of law resulting in confiscation of the property of the utilities. Also pursuant to Section 305, the utilities filed a motion for a stay of the December orders

pending this Court's decision on the Section 305 complaint. Later, the utilities took appeals to this Court, in accordance with 35 M.R.S.A. § 303, asserting errors of law in the action taken by the Commission, as embodied in its December 28 and 30, 1979 orders. After the presentation of evidence and oral argument before a Justice of this Court (the Chief Justice having disqualified himself in this case), the motion for stay was denied. Thereafter, the Section 303 appeals were consolidated with the Section 305 complaint proceeding, and an order issued authorizing an expedited presentation of the matter to this Court for its decision.

We identify the basic issues we are called upon to decide as the following: (1) whether 35 M.R.S.A. § 311 (hereinafter Section 311) gives the Commission general power temporarily to alter, or amend, (without the consent of the public utility affected) existing permanent rates of the utilities, should the Commission deem it necessary so to act to "prevent injury . . . to the interest of the people"; (2) if Section 311 confers such general power, whether 35 M.R.S.A. § 131 (hereinafter Section 131), the so-called "fuel adjustment" statute, precludes the Commission from exercising its general powers under Section 311 specifically as to the fuel adjustment clauses contained in the tariffs of the utilities pursuant to Section 131; and (3) even if the Commission had statutory authority to act as it did, whether (a) the Commission supported its actions by making findings, claimed by the utilities to be requisite, as to the justness and reasonableness (including non-confiscatory effects) of the permanent rates in effect at the time and of the particular alterations or amendments made in them, and (b) the Commission's actions were based on sufficient evidence.

### 2. The Section 311 Powers of the Commission.

Challenging the Commission's resort to Section 311 as the statutory source of the

---

5. The total replacement energy costs were $20 million. As of December 31, 1979, approximately $11.3 million had been dealt with; $8.7

million remained as the basis for adjustments yet to be billed.

power purportedly exercised here, the utilities contend that Section 311 authorizes Commission action "temporarily" to alter or amend existing permanent rates (without the consent of the public utility affected) *only* when there is injury, actual or threatened, to the business of a utility, and the injury is so substantial in its effects on the utility that *thereby* an emergency is created endangering the public interest.

Alternatively, the utilities argue that if Section 311 does not have this meaning but signifies, rather, that "injury . . . to the interest of the public" shall be a separate, and independent, standard of the regulatory power conferred upon the Commission, that standard is constitutionally inadequate, and Commission action pursuant to it must be held to be without legal effect.

*2–A. The Interpretation of Section 311.*

█ In *New England Telephone & Telegraph Co. v. Public Utilities Commission,* Me., 354 A.2d 753 (1976) this Court said that Section 311 gives the Commission an independent power to put "temporary" rates in effect, to operate only prospectively. *Id.,* at 763–64. To identify the occasions for, and the criteria of, the Commission's exercise of this power, the textual language of Section 311 mentions three different concepts, each of which is separated by the use of the disjunctive "or." We discern nothing else in the textual language of Section 311 to indicate anything other than that Section 311 means exactly what it says in plain disjunctive language: there are three *separate and independent* occasions for, and criteria of, the Commission's exercise of powers conferred by Section 311, one of which is the exercise of such power should the Commission deem it necessary "to prevent injury to . . . the interest of the people." We thus reject, as straining the language of Section 311 beyond its natural meaning, the claim of the utilities that the statue prescribes a single conjunctive criterion.

█ The argument of the utilities on this point suffers from the further infirmity that it purports to adduce case support by

misreading the statement of this Court in *New England Telephone & Telegraph Co. v. Public Utilities Commission,* Me., 354 A.2d 753, 763 (1976):

> "The *only* power given the Commission capable of being utilized to deal with the adverse consequences to a utility . . . resulting from . . . 'regulatory lag' . . . . is the power conferred by 35 M.R.S.A. § 311." (emphasis in original)

The plain meaning of this sentence is that for the purpose of protecting a *utility* against the adverse consequences of regulatory lag the Commission has only the power conferred by Section 311. It is an obvious logical fallacy to reverse the components of the sentence to make it read, as do the utilities in their argument, that the Commission's only power under Section 311 is to act for the purpose of protecting a utility against the adverse consequences of regulatory lag. Quite to the contrary, as we have already explained and as we decide, the Commission has power under Section 311 also to protect the ratepayers against the adverse consequences of regulatory lag whenever their interests, as distinct from those of a utility, are threatened with injury.

█ So deciding, we take the precaution to add the caveat that the Commission should not exercise such power lightly, or routinely. As our subsequent discussion of the meaning connoted by "interest of the people" will show, the power of the Commission to act in this regard derives from its overall powers and responsibilities to assure that any rates in effect, whether permanent or temporary, are just and reasonable, and that service to the public is adequately delivered. Hence, where, as here, the Commission confronts a special situation causing it to believe that it must act on a temporary basis to protect ratepayers against the danger that they will have paid a large amount of fuel adjustments ultimately found to have been unjust or unreasonable, the Commission has grounds to invoke its Section 311 powers.

██ Moreover, the action of the Commission in the present instance was an "alteration" or "amendment" of one facet embodied in the rates of the utilities; it was not a "suspension" of the rates. As to the "temporary" character of the Commission's action, Section 311 does not further elucidate, and we conclude that the circumstances of this case do not require that we determine, the outer temporal limits of what could qualify as "temporary" action by the Commission. It is sufficient that we decide, here, as we do, that the Commission's orders of May 5th and December 28th, which had the combined effect of spreading out until the end of 1980 charges by the utilities of fuel cost adjustments that under the fuel adjustment provisions of the existing tariffs would have been completed by July 31, 1979, involve a time-frame reasonably deemed "temporary."

### 2-B. Delegation of Power.

Most recently, in *Maine School Administrative District No. 15 et al. v. Raynolds, Jr., Commissioner et al.*, Me., 413 A.2d 523 (1980) we summarized this Court's view, as revealed in prior decisions, of the constitutional requirements for a valid delegation of power to an administrative body. We said that what is necessary is

" 'sufficient standards—specific or generalized, explicit or implicit' to guide the agency in its exercise of authority"

so that (1) administrative regulation can proceed in accordance with basic policy determinations made by the representatives of the electorate and (2) some safeguard is provided to help prevent administrative arbitrariness.

██ Applying this basic principle to the circumstances of the instant case, we conclude that the standard in Section 311, "prevent injury to . . . the interest of the people", conceived as an independent standard not necessarily involving injury to the business of a public utility as the source of injury to the public interest, is constitutionally adequate.

With Section 311 construed in the context of the many other pertinent statutory provisions in Title 35, prevention of injury to the "interest of the people" emerges as a "primary principle" which is constitutionally sufficient. The "public interest" is shown by Title 35 to encompass those facets of the Commission's regulatory functions that are directed to ensuring that the public receives adequate service, delivered in a safe and reliable manner, at a charge just and reasonable in relation to the public utility's costs of providing the service. *See New England Telephone & Telegraph Co. v. Public Utilities Commission*, Me., 376 A.2d 448, 454 (1977); *Bangor & Aroostook R. R. Re: Application to Amend P. U. C. Certificate J # 44*, 159 Me. 86, 188 A.2d 485 (1963); *In re Searsport Water Co.*, 118 Me. 382, 108 A. 452 (1919).

Section 51 specifically enunciates one aspect of these regulatory objectives by its statement:

"[t]he rate, toll or charge, or any joint rate made, exacted, demanded or collected by any public utility for the conveyance or transportation of persons or property between points within this State, or for any heat, light, water or power produced, transmitted, delivered or furnished, or for any telephone or telegraph message conveyed, or for any service rendered or to be rendered in connection with any public utility, shall be just and reasonable. In determining just and reasonable rates, the commission shall provide such revenues to the utility as may be required to perform its public service and to attract necessary capital on just and reasonable terms. Every unjust or unreasonable charge for such service is prohibited and declared unlawful. In determining just and reasonable rates, the commission may consider whether the utility is operating as efficiently as possible and is utilizing sound management practices." 35 M.R.S.A. § 51 (1978).

The foundational principle thus asserted in Section 51—that the Commission has responsibility to regulate the rates of a public utility to seek to assure that they are, and remain, just and reasonable not only from the utility's perspective of guaranteeing

sufficient return on investment to attract future investment but also from the ratepayers' perspective of the reasonable relationship of bills to costs incurred—is further reflected in Section 66:

"It shall be unlawful for any public utility to charge, demand, collect or receive a greater or less compensation, except as otherwise provided in section 103, for any service performed by it within the State or for any service in connection therewith, than is specified in such printed schedules, including schedules of joint rates, as may at the time be in force, or to demand, collect or receive any rate, toll or charge not specified in such schedules." 35 M.R.S.A. § 66 (1978).

To aid the Commission in achieving these paramount objectives, the legislature has made available to the Commission various specific mechanisms, among which is the power to investigate the management practices of a utility, *see* 35 M.R.S.A. § 4, to ensure that those practices are reasonable. To serve similar ends, Section 296 provides that:

"Whenever the commission believes that any rate or charge is unjust or unreasonable, or that any service is inadequate or cannot be obtained, or that an investigation of any matter relating to any public utility should for any reason be made, it may, on its own motion, summarily investigate the same with or without notice." 35 M.R.S.A. § 296 (1978).

Likewise, Section 291 provides that the statutorily prescribed aggrieved persons may file a complaint with the Commission, to have a prompt Commission investigation, when it is claimed that:

"any of the rates, tolls, charges or schedules or any joint rate or rates of any public utility are in any respect unreasonable or unjustly discriminatory, or that any regulation, measurement, practice or act of said public utility is in any respect unreasonable, insufficient or unjustly discriminatory, or that any service is inadequate or cannot be obtained." 35 M.R.S.A. § 291 (1978).

All of the foregoing statutory provisions thus reveal that, the "public interest" protected by the Commission is conceived *primarily* as an entitlement to adequate service at rates that are in all respects sufficient, reasonable and just. As infused by these paramount concepts, the standard "prevent injury to . . . the interest of the people" has a sufficiently intelligible content to serve as a primary principle confining administrative regulation within bounds set by the representatives of the electorate. It is therefore constitutionally adequate.

### 3. Section 311 as Affected by Section 131.

The utilities maintain that in Section 131, as applicable to the instant case,[6] the legislature expressed a mandate that ratepayers must pay to electric utilities, as a cost of service, their *actual* costs for fuel used to generate or supply electricity. From this premise the utilities purport to derive two consequences affecting the present case.

The first such consequence is that despite the *general* powers conferred by Section 311, Section 131 has deprived the Commission of the *particular* power, exercised here, to extend the period for collection of the additional fuel costs the utilities sustained

---

**6.** During the period of the shutdown of Maine Yankee Section 131 was in effect as enacted in 1975. P.L.1975 c. 489, § 1. In 1977 the legislature amended Section 131 by P.L.1977 c. 689. This amendment contained a transition provision, c. 689, § 2, which said:

"From the effective date of this Act until the effective date of its next general rate adjustment under Title 35, section 64 or 296, following the effective date of regulations promulgated pursuant to this section, each electric utility is authorized to continue billing its

fuel charge as authorized and directed by public law, 1975, chapter 489, section 1, as amended by public law, 1977, c. 475."

Since none of the instant utilities had been operating under rates promulgated as the result of section 64 or 296 rate adjustment, the superseded Section 131 governs as to them. As of January 1, 1980, however, Commission regulations pursuant to P.L.1977 c. 689 § 1 became effective with respect to Bangor Hydro. Central Maine and Maine Public Service still operate under the 1975 statute.

as a result of the shutdown of Maine Yankee from March 15 to June 9, 1979. By spreading out the period of collection as it did, the Commission subjected the utilities to additional and nonrecoverable carrying costs. Hence, the *net* amount of fuel costs the utilities will collect from the ratepayers will be less than the amount of their *actual* additional fuel costs attributable to the Maine Yankee shutdown, in violation of the Section 131 mandate.

This mandate has the second consequence as to the present case, say the utilities, of making irrelevant Commission consideration of whether the *actual* fuel costs of the utilities were just and reasonable costs and whether it may be just and reasonable to pass them through to the ratepayers. From this it follows, the utilities argue, that (1) the Commission lacked authority to undertake its underlying investigation directed to these considerations of justness and reasonableness; and (2) the underlying investigation being unauthorized, it was error for the Commission to rely on the period that it would be in process as a primary ground for the invoking of Section 311 powers.

We cannot agree that these consequences asserted by the utilities flow from Section 131 because we reject the utilities' premise that Section 131 states a legislative mandate for the recovery of *actual* fuel costs as a cost of service.

■ Our view of Section 131 is that it aims to maintain justness and reasonableness in the rates of electric utilities in the face of the fact that fuel expenses are a major item of their costs and that the expenses of fuel tend to be fluctuating. To achieve this objective, Section 131 sets up a general methodology for effectuating adjustments regarding the fuel component involved in the rates of electric utilities on a standardized basis and thereby avoids the need of the frequent Commission hearings and proceedings that would otherwise be necessary. In this methodology is embodied a formula which yields a *fuel rate* as to a current billing period, and it is on the basis of this fuel rate that the fuel charge is made to an individual ratepayer in such current billing period.

By thus characterizing the function of Section 131, we make plain that we have concluded that Section 131 does not give rise to a "cost of service" tariff, so-called, entitling electric utilities to recover their *actual* past fuel expenses dollar for dollar by deferred billing. Rather, Section 131 prescribes a methodology by which on a standardized basis a fuel *rate is fixed* for a *current* billing period by projection from the experience of a *past* period, as a test period, of fuel expenditures. The rate thus fixed is deemed just and reasonable as constituting a reasonable enough projection of the fuel expenditures for the *current billing period.*

We have reached this conclusion after close examination of the textual language of Section 131 [7] in light of past and present Commission implementation of the methodology for fuel cost adjustments, and also by following the guidance of other courts that have grappled with problems paralleling those now before us.

Section 131 authorizes the utilities to include in a current billing period a "fuel charge." This "charge" is determined by multiplying the individual ratepayer's actual usage of electricity, as measured by kilowatt hours *in the current billing period,* by a "fuel rate." The fuel rate is computed by dividing the "total cost of fuel used . . *which is applicable to a billing period*" (em-

---

7. Section 131(1) provides as follows:

"The cost of any and all fuel used by an electric utility in generating or supplying electricity to a customer shall be included in the itemized fuel charge and shall be billed at a single uniform rate per kilowatt-hour used by a customer. Such fuel charge shall be the fuel rate multiplied by the number of kilowatt-hours used by a customer. The fuel rate shall be uniform for all customers of any electric company, and that rate shall be calculated by dividing the total cost of fuel used in generating or supplying electricity which is applicable to a billing period by the total number of kilowatt-hours used by all customers."

phasis added) by the total number of kilowatt hours used by all customers.[8]

We focus upon the language "cost of *fuel used* in generating or supplying electricity which is *applicable to a billing period*" (emphasis added) as the critical language supporting our rejection of the utilities' argument that Section 131(1) preempts *any* Commission discretion in implementing the fuel adjustment charge. The words given emphasis reveal that "fuel used" can operate as a factor in any given computation *only after* a determination has been made as to *what particular* fuel used is to be "applicable to a billing period." The statute thus contemplates that before there can be computation of, first, the "fuel rate" and, second, the fuel adjustment "charge", the Commission must act, using its expertise, to fix some period of time within which fuel was used prior to a current billing period to identify what "fuel used" is "applicable" to that current billing period. Thus, the *content* of one critical factor in the Section 131 formula is to be supplied by Commission exercise of regulatory discretion; the Commission must designate what past period shall be the "test" period by which the "fuel" which governs as to a current billing period is to be determined.

This interpretation of Section 131 as derived from its textual language is further supported by past practice in the computation of fuel adjustment charges. Before the enactment in 1975 of a statute to govern as to fuel cost adjustment, the Commission had exercised its regulatory power to require, and prescribe the methodology of, regularized adjustment of rates to accommodate for fluctuations in the fuel costs of generating and supplying electricity. The Electric Rate Schedules of the instant utilities in effect prior to the 1975 statute (as well as those in effect after 1975) reveal

that the 1975 statute incorporated essentially the same methodology previously put in effect by the Commission. Particularly evident is the fact that prior to 1975 the Commission at times changed the reference period for determining "costs of fuel consumed" for purposes of computing the "fuel rate" applicable to a current billing period.

For example, at the time of the March 15, 1979 shutdown of Maine Yankee, the utilities were still using a "rolling average" method based on "three months" which the Commission had ordered in effect in 1974 for the billing of the adjustments as to fuel costs. Under that method the utilities would figure the current bill for a given month by using the cost of the fuel consumed over the three month period ending with the second preceding month before the billing month. Thus, more concretely, the charge for January, reflecting the adjustment for fuel costs, would be determined by adding into January's projected "base" rate (the predetermined amount based on the test year results) the fuel costs for the preceding months of September, October, and November. The charge for February, reflecting the adjustment for fuel costs, would be based upon the fuel costs for the preceding October, November, and December; and so on. The total fuel costs for the three month period thus "applicable" for the purposes of a current billing would then be divided by the total kilowatt hourage, and that rate (the "fuel rate") would be multiplied by the individual ratepayer's kilowatt hourage in the current billing period.

Prior to the introduction of this "three months rolling average" method of computing "applicable" fuel costs, the Commission had authorized the utilities to use a "twelve months rolling average" method. As the name suggests, by this latter method the

8. The language setting forth the divisor in the computation of the fuel rate—"total number of kilowatt-hours used by all customers"—is ambiguous. It could refer to either the total kilowatt-hours used during the current billing period, or to the total kilowatt hours used during the previous period in which the costs for the fuel were sustained. In its implementation of the fuel adjustment provision the Commission

adopted the latter of the two possible interpretations.

Because, however, the fuel rate is ultimately applied to the kilowatt hours consumed in the *current* billing period (for which actual costs would not have been determined), the ambiguity has little bearing on our characterization of the fuel adjustment clause.

fuel costs "applicable" to a current billing period were averaged over the *twelve* month period ending with the second month preceding the current billing period. The Commission changed to the "three month rolling average" after Central Maine and Maine Public Service in 1974 requested a change in the twelve month averaging method, their claim being that it did not adequately reflect the rapid increases in the cost of fuel in time for the utilities to recover an adjustment more closely approximating their actual expenditures.

This history shows that when the legislature enacted Section 131 in 1975 to prescribe by statute that there shall be regularized rate adjustments to accommodate to changing fuel costs and establishing the general formula to be used for such adjustments, the legislature preserved prior practice to the extent that it left for discretionary determination by the Commission what prior costs of fuel used are to be applicable to a current billing period for the purpose of computing the "fuel rate." By leaving that determination to Commission expertise, the legislature provided an obviously desirable flexibility to deal with the range of unpredictable factors that could be involved in fuel cost fluctuations and their impact on the justness and reasonableness of the rates of electric utilities.

Several recent federal cases lend support to our conclusion that the fuel adjustment provision in Section 131 is a general formula to permit the effectuation, on a fundamentally routine basis, of a just and reasonable rate fixed for a current billing period by resort to a "test" past period of fuel expenditures, and that it is not a mechanism through which electric utilities are enabled to recover, dollar-for-dollar as a cost of service, their *actual* expenses for fuel.

In *Jersey Central Power Co. v. Federal Energy Regulatory Commission*, 589 F.2d 142, 145 (3rd Cir. 1978) the Third Circuit Court of Appeals was called upon to characterize a statutory fuel adjustment provision similar to that in Section 131. The utility sought to recover, through a surcharge, unbilled fuel costs under a superseded fuel clause, after it had ascertained that the implementation of a new billing procedure did not account for those fuel expenses arising in the "lag period", (the period between the last billing under the superseded fuel clause and the effective date of the new fuel clause). The utility's contention was that the superseded fuel clause was designed to afford reimbursement of the *actual* costs incurred in the applicable billing period, and, hence, the company had accrued rights in the unbilled costs. The Federal Energy Regulatory Commission denied the requested surcharge on the ground that it would be a retroactive, and therefore unauthorized, recovery of fuel costs not included in the superseded fuel clause.

In the Third Circuit's view the resolution of the issue hinged upon the correct characterization of the fuel adjustment clause, which, like the Maine provision, applied to the kilowatt hours supplied during a current billing period an "energy cost adjustment factor" determined by reference to costs of fuel used in some prior period. The Court rejected the claim that such a fuel adjustment clause provided for cost of service reimbursement to the utilities, since, the Court reasoned,

"[i]f that were the aim, then the billing should have been computed on the basis of the kilowatt-hours used during the month in which the fuel charges were actually incurred. If, as Jersey Central argues, it was collecting actual fuel costs on a deferred basis, the company would have had to defer collections for several billing periods before recovering costs for the preceding months." *Jersey Central Power Co., supra*, at 145.

*See also Public Service Co. of New Hampshire v. Federal Energy Regulatory Commission*, 600 F.2d 944 (D.C.Cir. 1979); *Virginia Electric and Power Co. v. Federal Energy Regulatory Commission*, 580 F.2d 710 (4th Cir. 1978).

Also applicable to the situation we confront is one additional point made by the Third Circuit. It is of the essence of a "cost of service" fuel charge that each particular

ratepayer shall pay the additional fuel cost of the service *provided to him*. Under the kind of methodology involved in the *Jersey Central* case, as under the Section 131 methodology, however, if a particular ratepayer's use of electricity fluctuates markedly from month to month, that ratepayer would pay a disproportionate amount were his kilowatt hours in the billing month not to match those of the previous period in which the fuel costs were incurred. *Jersey Central Power Co., supra*, at 145. Similarly, ratepayers who are new to the system pay for fuel costs arising before they began service, while ratepayers who terminate their service avoid paying their share of such costs. *Id.*, at 145; *Public Service Co. of New Hampshire, supra*.

Having thus concluded that Section 131 establishes a "fixed rate" fuel adjustment tariff, rather than an actual "cost of service" tariff, we turn to the other consequence claimed by the utilities, that Section 131 denies the Commission power to conduct its underlying investigation into the justness and reasonableness of passing through to the ratepayers all, or some, of the adjustments as to fuel costs arising from the March, 1979 shutdown of Maine Yankee and, therefore, the Commission committed error in relying on the pendency of that investigation as a reason to extend the period for making charges of the fuel cost adjustments reflecting costs of that shutdown.

We decide that this contention of the utilities is unsound. We so hold on the dual grounds of (1) our immediately preceding conclusion that even within the internal provisions of Section 131, the Commission is called upon to exercise its discretion to provide a "test" period of past fuel expenditure experience that will allow for fixing a just and reasonable rate to govern charges in a current billing period, and (2) our earlier conclusion, explained in our analysis of the meaning of the Section 311 standard "interest of the people", that deeply embedded in the overall statutory scheme of regulation

is the overarching responsibility, and correlative power, of the Commission to assure the justness and reasonableness of rates. For both of these reasons we could be persuaded that the legislature had singled out the area of fuel cost adjustments to take the radical step of depriving the Commission in that special context of its otherwise paramount, and extensive, authority to investigate and determine the justness and reasonableness of rates only were we to find legislative language expressly, affirmatively, directly and unequivocally requiring that conclusion. We fail to find such compelling language in Section 131.

■ We decide, therefore, that Section 131 does not divest the Commission of authority to investigate the justness and reasonableness of passing through to ratepayers adjustments based on the increased fuel costs resulting from the Maine Yankee shutdown.

■ The additional argument of the utilities that the December, 1979 Orders violated 35 M.R.S.A. § 66, which makes it unlawful for a public utility

"to charge, demand, collect or receive a greater or less compensation . . . for any *service performed* . . . than is specified in such printed schedules . . as may at the time be in force" (emphasis added),

must fail in light of the formula legislatively set out in Section 131. The determinative inquiry, here, is the time when "service" is "performed" within the meaning of Section 66. The utilities say that the service was performed when they in fact sustained the fuel costs (that are involved in the rate adjustments) as part of the process of delivering electrical energy to the ratepayers during the Maine Yankee shutdown. However, the adjusted rate charged to the ratepayer derives from application of the formula prescribed by Section 131, which requires application of those costs to the kilowatt hours in the current billing period to determine the "fuel charge." Hence,

because of the controlling effect of the Section 131 formula in determining the rate for charges, the service for which the charge is made must be held "performed" at the time of the delivery of those kilowatt hours *that are subject to the "fuel charge"* rather than the time when the additional fuel costs attributable to the Maine Yankee shutdown were actually sustained.

In upholding the Commission's authority to extend the charging period and to investigate the pass-through of charges as to fuel adjustments, we also reject secondary arguments advanced by the utilities in support of their asserted limitations on Commission authority.

One such argument is that the Commission itself recognized its limited authority to investigate the pass-through of fuel adjustments, as shown, say the utilities, by a 1975 decision of the Commission addressing the fuel adjustment methodology the Commission had established before the legislature dealt with the subject by enacting Section 131. The utilities refer to the Commission's statement in that decision:

> "Under the present fuel adjustment clause, the costs of shutdowns and curtailments of a type or frequency in excess of normal expectations are also borne by the customers, even if the shutdown or curtailment were the result of *defective equipment* or of *operational negligence.*" *In re Central Maine Power Co.*, 8 P.U.R. 4th 277, 300 (Me. P.U.C. 1975) (emphasis added)

The language we have emphasized in this quotation, and also a sentence that appeared in the Commission's decision immediately after the one quoted, reveal that the utilities have misconceived the Commission's thinking. In the subsequent sentence the Commission made the further statement that it "does not feel that the customers should *automatically* be the company's insurer against *all* contingencies." *Id.*, at 300. (emphasis added). Moreover, the Commission's underlying investigation in the case at bar is directed to the question of

the justness and reasonableness of passing through fuel cost adjustments based on increased fuel costs occasioned by a fundamental flaw in the *design* and *construction* of a generating plant; it has nothing to do with "defective equipment" or "operational negligence" as a cause of increased fuel costs.

Also unpersuasive is the argument of the utilities that bills submitted to, but not enacted by, the 109th legislature tend to show the Commission's lack of power to conduct the underlying investigation regarding adjustments projected from the extra fuel costs arising from the March 1979 shutdown of Maine Yankee. One such bill to amend Section 131, entitled "An Act to Grant the Public Utilities Commission Jurisdiction to Review Adjustments under the Fuel Adjustment Clause", L.D. 1567, purported to give the Commission jurisdiction to review on its own motion "any costs" resulting from the March 15, 1979 shutdown of Maine Yankee and also to deny such costs as may be found to be unjust or unreasonable. Also presented was a bill entitled "An Act to Prohibit Unreasonable and Unjust Fuel Charges from Being Passed on to Consumers", L.D.1580, which was designed to prohibit utilities from passing through to ratepayers increased fuel costs resulting from the closing of power generating facilities found either to be defective in design or equipment, or to have been negligently operated.

The utilities contend that the non-enactment of these bills reveals that Section 131 excludes Commission intervention in, or regulation of, the process of fuel cost adjustment. We reject this contention, particularly in light of our prior analysis of the legislative language in Section 131 itself, as infused by the legislative intendment manifest in the entirety of the statutory scheme to confer upon the Commission a paramount authority to maintain the justness and reasonableness of rates. The proposed amendments to Section 131 may fairly be regarded as nothing more than efforts, un-

dertaken in abundance of caution, to make explicitly plain beyond possibility of rational argument that in the particular contexts referred to the Commission had authority to act by virtue of its unquestioned comprehensive and paramount power, already existing, to ensure that public utility rates shall be just and reasonable.

### 4. The Utilities Contentions as to Lack of Requisite Findings and the Insufficiency of the Evidence.

Anticipating the possibility that this Court might decide, as we have decided, that the Commission had constitutionally valid statutory authority for the general type of action involved in its Orders of December 28 and 31, 1979, the utilities have directed attacks against particular aspects of the manner in which the Commission purported to act. They say that (1) the Commission omitted to make certain requisite findings, and (2) the evidence was insufficient to support the action taken.

### 4–A. The Alleged Lack of Requisite Findings.

The utilities contend that it is a precondition of the legality of the exercise of its authority under Section 311 that the Commission make certain findings regarding justness and reasonableness.

The argument of the utilities on this point, however, is not entirely clear. It appears to be the assertion of the position that the Commission, to make a valid *temporary* alteration of an existing permanent rate, first must investigate, and on the basis of ·that investigation make a finding regarding, whether the existing *permanent* rate to be altered has itself continued to be just and reasonable as a *permanent rate.* Only in this manner, the claim seems to be, can the Commission have an adequate foundation for a second requisite step: a determination and finding that the temporary alteration the Commission will be putting in effect is just and reasonable.

The Commission so interprets the position of the utilities and sharply contests its soundness. The Commission argues that were we to accept the utilities' contention, we would nullify Section 311. By requiring the Commission to evaluate the continuing justness and reasonableness of the existing rate as a permanent rate we would inject into a Section 311 proceeding the prolonged and complex kind of investigation involved in proceedings under Section 69, or Sections 291–298, and this would preclude the quick preventive action, on a temporary basis, that it is the purpose of Section 311 to authorize.

On the hypothesis that the utilities are taking the position the Commission attributes to them, we decide that it is indeed unsound. The Commission may make a *temporary* alteration of an existing rate under Section 311 without need for an investigation, and finding, regarding the continuing justness and reasonableness of the existing rate to be altered from the perspective of its being a *permanent* rate— that is, as viewed from the perspective that the rate is to continue in effect during an indeterminate future period. Considerations geared to the indeterminate future are uniquely matters for Section 69 or Sections 291–298 proceedings, and to introduce them into Section 311 proceedings would render such proceedings nugatory, through commission of the error of a "critical shift of material time-frame perspective" explained by this Court in *New England Telephone & Telegraph Company v. Public Utilities Commission,* Me., 354 A.2d 753, 769–70 (1976).

From this analysis it does not follow, however, that in exercising its powers under Section 311, the Commission is entirely free of obligation to assess justness and reasonableness in any aspect, more particularly from the perspective of the altered rate's being in effect as a *temporary* rate. As we have clarified in our prior discussion of the "prevent injury . . . to the interest of the people" standard set forth in

Section 311 (Part 2–B, ante), this standard is constitutionally valid because implicit in it is a requirement of justness and reasonableness, pursuant to the mandate of the entirety of the statutory scheme of regulation that any rate made effective by the Commission is to be just and reasonable. Hence, in making effective under Section 311 a *temporary* rate (by alteration of any existing rate) as deemed necessary to prevent injury to the interests of the people, the Commission must address justness and reasonableness from the perspective that the rate is to have temporary effect.

Such a precondition of valid action under Section 311 does not deprive the Commission in practical terms of its Section 311 powers. The considerations affecting the justness and reasonableness of a rate in its aspects as a temporarily effective rate are so different in kind from those relative to the effectiveness of a rate as a permanent rate, *see New England Telephone & Telegraph Company, supra,* at 769–70, that justness and reasonableness in the perspective of temporariness can be adequately evaluated by the Commission in sufficient time to permit effective action under Section 311.

■ The record shows that, here, the Commission made such requisite determination of justness and reasonableness *relative to the temporary nature* of the altered rate to be made effective. We hold adequate for this purpose the Commission's express statement:

> "[W]e conclude that an additional alteration of the utilities' tariffs under 35 M.R.S.A. § 311 to extend the recovery period through 1980 is just and reasonable in order to minimize injury to the interest of the people while not causing substantial injury to the utilities."

The last remaining question, then, is whether this determination was supported by adequate evidence.

### 4–B. The Sufficiency of the Evidence.

Before proceeding to the details bearing on the sufficiency of the evidence, we stress two preliminary points.

■ First, it is our duty to sustain whatever findings *of fact* underlie the Commission's ultimate determinations on the basis of all of the evidence of record, regardless of the source from which the evidence might have come, if the findings of fact are not clearly erroneous, i. e., are basically supported by the totality of the evidence of record, *see Sanford Highway Unit of Local 481 v. Town of Sanford et al.,* Me., 411 A.2d 1010 (1980); *New England Telephone & Telegraph Company v. Public Utilities Commission,* Me., 390 A.2d 8, 57 (1978); *In re Central Maine Power Company,* 152 Me. 32, 36, 122 A.2d 541, 543 (1956); *Everett T. Chapman, Re: Petition to Amend,* 151 Me. 68, 70, 116 A.2d 130, 131–132 (1955).

■ Second, insofar as the Commission's ultimate determinations involve the application of a legal standard to facts found, this Court's responsibility is to review whether the standard applied by the Commission was correctly conceived in accordance with law, and any judgmental aspects of the application will be upheld unless bounds of rationality are exceeded.

As we have already explained, the December 28th Order enlarging the recovery period beyond that fixed by the May 5th Order was based on the evidence of record on which the Commission had relied when it made the May 5th Order, supplemented by: (1) an exhibit showing the revised total additional fuel costs arising from the shutdown of Maine Yankee, the percentage reflected in charges already billed to the ratepayers as of December 31, 1979 and the remaining percentage yet to be billed, and (2) the schedule fixed for the future proceedings to be held in the Commission's underlying investigation of the justness and reasonablness of passing through to the ratepayers all, or some, adjustments as to fuel costs sustained by the utilities in consequence of the Maine Yankee shutdown.

The utilities attack the adequacy of all of this evidence in two respects. First, while

conceding that it was not until the December 10, 1979 pre-hearing conference that both of the supplemental items of evidence became matters of record, the utilities contend that the Commission had substantial knowledge of them before, or at least by the time of, its November 2, 1979 Order in which it denied the Maine Committee's first request for an amendment of the May 5th Order. Hence, argue the utilities, no principled basis really exists for distinguishing between the factual foundation of the Commission's December, 1979 Orders and its May 5 and November 2, Orders. In any event, the utilities maintain, second, that the evidence fails to justify an ultimate determination of "injury to the . . . interest of the people", according to the correct conception of the legal meaning of that standard.

■ Addressing the utilities' first contention, we conclude that the record adequately shows that when the Commission issued its May 5th Order, it did not know the full extent of the increased fuel costs to the utilities that would be caused by Maine Yankee's being shut down. The pre-hearing conference leading to that Order was held, and the Order was issued, at a time approximately at the mid-point of what it eventuated was the total period of the shutdown. In May, the Commission tailored the specifications of the charging period to the *then-estimated* shutdown costs.

Moreover, regardless of what information the Commission may have obtained informally while in the process of considering the Maine Committee's August 20, 1979 motion for change of the charging period, such information had not been entered upon the record at the September 17, 1979 pre-hearing conference on which the Commission based its November 2, 1979 Order. Hence, for the purposes of that November 2 Order, the Commission properly declined to consider facts that were not part of the record.

Similarly, in regard to the other supplemental item of evidence pertinent to the December, 1979 Orders—the schedule of the future hearings in the Commission's underlying investigation,—we cannot speculate whether the Commission was aware of this scheduling when it considered the Maine Committee's August 20, 1979 motion to amend the May 5th Order. The schedule was not finally announced until November 20, nearly three weeks after the November 2 Order denying the August 20 motion to amend. In its November 20th Notice of Hearing announcing the schedule, the Commission said:

"This Commission *now determines* that hearings shall be held to further investigate this matter . . . ." (emphasis added)

This statement sufficiently shows that it was then, November 20, that the Commission had made the definitive decision that such hearings would be held. Thus, although there might have been a general indication at the time the November 2 Order was issued that there would be hearings in the underlying investigation and that they would extend over a lengthy period, nothing in the record reveals that the Commission knew as of November 2 how much time would be involved.

We also reject the second contention of the utilities, that application of the correct conception of the governing legal standard establishes that the further spread-out of the period for the charging of fuel adjustments effectuated by the December, 1979 Orders is unsupportable.

We are not persuaded by the utilities' contention that the Commission's misconception of the correct meaning of the governing legal standard is established by the Commission's statement that it must engage in a "balancing of interests." In general, the Commission correctly articulated, and purported to apply, a standard in the very language Section 311 prescribes it, as appears from its ultimate conclusion:

"This Commission thus deems it necessary in order to minimize further injury to the interest of the people that the

recovery of replacement power costs remaining to be billed as of December 31, 1979, be further extended through the end of calendar year 1980."

We take the Commission's incidental reference to "balancing of interests" to be a shorthand way of expressing the point that adequately to evaluate the justness and reasonableness in temporary terms of the alteration it proposed to make effective, the Commission must examine not only the effects, in the overall, on the ratepayers but also the effects on the utilities and, in addition, how these impacts interrelate. Such approach does not reflect that the Commission's conception of the governing legal standard was incorrect or that the standard was being applied in an illegal manner.

Further in regard to the correct legal meaning of the governing standard, the utilities argue that a finding of "an emergency" constituted by the danger of substantial injury is necessary to justify exercise of Section 311 powers. Our prior analysis (in Part 2–B) of the standards delineated in Section 311 reveals the error of this contention. We there concluded that "injury . . . to the interest of the people", stated in Section 311 without being modified by the word "substantial", establishes a separate and independent standard which is constitutionally adequate. Hence, the utilities continue to be wrong when, once again, they seek by their present argument to merge the disjunctive standards stated in Section 311 into a single conjunctive criterion.

We turn, then, to the final question of the sufficiency of the evidence to support the factual findings made by the Commission.

With regard to the findings as to the nature of the injury to the ratepayers, we have already referred to the evidence supporting it: the schedule fixed for hearings in the Commission's underlying investigation and the exhibit giving the complete details as to the total amount of the increased fuel costs the utilities had sustained because of the shutdown of Maine Yankee, the percentage reflected in adjustments that had already been billed and the percentage remaining to be billed.

This evidence showed the total replacement power costs to be $20,064,944, and that while the spread-out ordered May 5, 1979 was to remain in effect, adjustments as to 56% of these costs ($11,297,722) would have been billed to ratepayers as of December 31, 1979, and adjustments as to the remainder, $8,767,222, would be billed over the first seven months of 1980. The settled schedule of future hearings in the Commission's underlying investigation projected that a final decision by the Commission would not be forthcoming until mid-April 1980, at the earliest.

Thus, it was shown that (1) by the time a decision in the underlying investigation would be reached, the ratepayers already would have paid the bulk of the fuel cost adjustments attributable to the Maine Yankee shutdown, and (2) this prospect exposed the ratepayers to the danger that were the Commission ultimately to find that it was unjust or unreasonable for those fuel adjustments to have been paid in whole, or in part, such determination would come too late to have, as a practical matter, beneficial effect.

All of the evidence, therefore, sufficiently supported the Commission's finding:

"by the time a decision is rendered in this case as much as 90% of the replacement power costs associated with the shutdown will have been billed to the utilities' customers. Thus, substantial injury to the interest of the people may result because, if the Complainants prevail in this proceeding [the underlying investigation] little of the replacement power costs remain to be affected by a Commission decree."

The other Commission finding on which its December, 1979 Orders rested is the finding that injury to the utilities would be insubstantial.

As to this, the record on which the Commission acted included the evidence on which it had relied to make the May 5, 1979 Order and the additional evidence presented in December, 1979, which afforded the Commission the information, to which we have previously alluded, that (1) the total of the increased fuel costs resulting from the entirety of the Maine Yankee shutdown period was $20,064,944, and (2) of this total amount adjustments as to all but $8,767,222 would have been billed to ratepayers as of December 31, 1979, leaving (3) the billing of the adjustments for this remaining $8,767,-222 to be completed, in accordance with the period prescribed by the May 5 Order, by July 31, 1980.

The evidence thus showed that the injury to the utilities which would result from the spread-out to be effectuated by the December, 1979 Orders would be only increased carrying costs, arising because the utilities would be billing for collection of the adjustments as to $8,767,222 (the remainder of the increased fuel costs caused by the Maine Yankee shutdown) over the one year period of January 1, 1980 to December 31, 1980 instead of over the seven months' period of January 1, 1980 to July 31, 1980.

The evidence before the Commission when it made its May 5, 1979 Order was sufficient, we hold, to support the Commission's underlying finding (as to that Order) of insubstantial injury to the utilities.[9] That evidence, as continuing to be part of the record relative to the Commission's December 28 and 31, 1979 Orders, continued to be sufficient, we decide, to support the Commission's finding that the utilities would be caused an insubstantial injury by

those Orders such that the justness and reasonableness of the temporary rates made effective by those Orders would not be impaired.

As to this, we find unpersuasive the purported countering argument of the utilities that the Commission itself had made plain that it believed the evidence which supported the May 5th Order would not be adequate, even as of November 2, 1979, to show the nature of the injury to the utilities. The utilities contend that this is the effect of the statement in the Commission's November 2, 1979 Order refusing to amend the May 5, 1979 Order:

> "No additional evidence has been presented to demonstrate that a pass-through period of twenty-four months or more would satisfy this balancing test [as to the harm to the utilities and the harm to the ratepayers]. Accordingly, this Commission refuses at this time to amend its previous decision, which was based on the same evidentiary record presently before us."

We disagree that this is the plain import of the statement. It would be a reasonable interpretation of it to conclude that it was not referring at all to a need for additional evidence regarding the nature of the harm to the utilities. Rather, the meaning could fairly be taken to be that the Commission would not consider extending the pass-through ordered in May, 1979, which would terminate July 31, 1980, for an additional twelve months to terminate July 31, 1981 (thereby to effectuate a pass-through of "24 or more months"), without additional evidence showing that since May 5 circumstances had changed to *enlarge the injury*

---

**9.** We note in this regard that the utilities did not seek judicial review of the May 5th Order, and they did not subsequently contend before the Commission, or before us, that the injury caused them by the May 5th Order had been such as to render unjust or unreasonable the temporary rate that became effective in consequence of that Order.

Included in the record relating to the May, 1979 proceedings was evidence as to injury to the utilities which was directed to approxi-

mately the same amounts of money (representing the then estimated extra fuel costs arising from what was then reasonably anticipated to be the duration of the shutdown of Maine Yankee) as the $8,767,222 shown by the supplemental evidence presented at the 1979 proceedings to be the remainder of the total increased fuel costs arising from the *actual duration* of the Maine Yankee shutdown, and as to which fuel adjustments remained to be billed after December 31, 1979.

*to the ratepayers*, and therefore that it had become necessary to enlarge the time within which the ratepayers would pay the fuel cost adjustments.

 Furthermore, even if we assume that the Commission might have been of the opinion at the beginning of November, 1979 that it would want additional evidence regarding the harm to the utilities by virtue of a spread-out to extend so far into the future as July 31, 1981, or later, it does not follow that the Commission would also have believed (on November 2) that it would need additional evidence of harm to the utilities were it aiming to effectuate a spread-out only until December 31, 1980 (five months beyond the termination date fixed by the May 5, 1979 Order)—which was the spread-out in fact effectuated by the December, 1979 Orders. In any event, the Commission's (November 2) attitude in this regard could well have been influenced in the direction of deeming such additional evidence unnecessary—as it obviously was so influenced in December, 1979 and justifiedly, as we are now deciding,—had there been presented to it in November the additional evidence entered of record in the December, 1979 proceedings which showed likelihood of greater harm to the ratepayers than had previously appeared.[10]

We are not unmindful that on prior occasions we have noted that in this State's system of public utility rate regulation there inheres a large, even undue, measure of regulatory lag and that for most of the adverse consequences of that lag the system provides no remedy to those affected. Yet, we have recognized, too, that at least as to the harsher adverse consequences of regula-

tory lag, the legislature has afforded a remedial mechanism by authorizing the Commission, in Section 311, to put temporary rates in effect.

In the present case the Commission resorted to Section 311. We decide that it did so justifiedly, correctly conceived the meaning of that Section's provisions, and acted without legal error in applying the provisions to the circumstances this case involves.

The entry is:

Each Section 303 appeal is denied.

On the Section 305 complaint, judgment for defendants.

The December 28, and 31, 1979 Orders of the Commission are affirmed.

All concurring.

---

10. Since we decide that the Commission's December, 1979 Orders were supported by sufficient evidence affirmatively of record, we have no occasion to be embroiled in the controversy among the parties as to who may have borne either the burden of coming forward with evidence or the ultimate burden of proof. More specifically, we need not decide whether in the overall posture of this case, and for the purposes of applying the "burden of proof" mandate of 35 M.R.S.A. § 307 either before the Commission or as to the Section 305 complaint before this Court, the "party adverse to the commission or seeking to set aside any determination, requirement, direction or order of . . . [the] commission complained of as unreasonable, unjust or unlawful as the case may be" was the utilities or the Committee for Utility Rate Reform.