**CENTRAL MAINE POWER COMPANY**

v.

**PUBLIC UTILITIES COMMISSION et al.**

Supreme Judicial Court of Maine.

Argued May 15, 1981.

Decided July 30, 1981.

Pierce, Atwood, Scribner, Allen, Smith & Lancaster by Gerald M. Amero (orally), Peter J. Jacobs, James G. Good, Portland, Seward B. Brewster, Augusta, for plaintiff.

Stephen A. Johnson (orally), Horace S. Libby, Cushing W. Pagon, Augusta, for defendants.

Paul A. Firtzsche, Portland, Pine Tree Legal Ass'n, (orally), for Maine Committee for Utility Rate Reform.

Before WERNICK, NICHOLS, ROBERTS and CARTER, JJ.

WERNICK, Justice.

On February 1, 1980, pursuant to 35 M.R. S.A. § 64, Central Maine Power Company

(the Company) filed with the Public Utilities Commission (PUC) a revised schedule of rates designed to increase the Company's revenues by $35,000,000.

By order dated February 27, 1980, the PUC suspended the operation of the revised rates for three months. A second order, extending this suspension period for an additional five months, was entered on May 29, 1980. *See* 35 M.R.S.A. § 69. Meanwhile, on April 2, 1980, intervenor status was granted to all parties filing petitions for intervention. Hearings examining the Company's revenue requirements were conducted in May, June, July, and August, 1980.

By a decision entered on October 31, 1980 the PUC disallowed the proposed rates. Instead of the $35,000,000 increase in gross revenues that the Company sought, the PUC authorized an increase of $16,185,000. Substitute rates conforming to the October 31 decision were filed by the Company and approved by supplemental order of the PUC.

Pursuant to 35 M.R.S.A. § 303, the Company appealed from the October 31 decision and supplemental order. It also filed a complaint under 35 M.R.S.A. § 305 (Section 305 complaint) requesting this Court (1) to hold unconstitutional that portion of the decision ordering the Company to submit a plan phasing out its employee discount and (2) to grant "such other and further relief as the nature of the case may require."

By notice dated December 2, 1980, the Maine Committee for Utility Rate Reform and Bruce Reeves, intervenor below, appealed and cross-appealed the October 31 decision and supplemental order.

This Court has consolidated the Company's Section 305 complaint and Section 303 appeal with the Rate Reform Committee's appeal and cross-appeal. With respect to issues raised by the Rate Reform Committee, the Company is an appellee; otherwise, the Company is an appellant.

Six issues have been brought forward by the Company:

(1) Is the PUC powerless to order the Company to phase out its employee discount because such State regulatory action is pre-empted by the National Labor Relations Act, and, if not, does the PUC's Order nevertheless violate Maine law?

(2) Did the PUC abuse its discretion by (a) removing from rate base a defective muffler at replacement cost instead of at original cost less depreciation and (b) failing to allow the Company to amortize the undepreciated value of the defective muffler over the useful life of the plant?

(3) Did the PUC abuse its discretion by excluding from rate base the Company's investments in properties held for future use in Richmond and Canco Road, Portland?

(4) Did the PUC abuse its discretion in requiring the Company to capitalize A.F.U.D.C. at a "gross" rather than a "net rate"?

(5) Did the PUC abuse its discretion by refusing to allow the Company to amortize the A.F.U.D.C. capital costs of expenditures associated with the now cancelled Sears Island Nuclear Plant?

(6) Did the PUC abuse its discretion by the manner in which it reduced the Company's working capital requirements for fuel inventory?

The intervenors, Maine Committee for Utility Rate Reform and Bruce Reeves (Rate Reform Committee), have raised three additional issues:

(7) Did the PUC misinterpret a statutory mandate when it postponed to a second phase of the proceedings consideration of whether minimum distribution costs should be excluded from the residential customer charge?

(8) Did the PUC abuse its discretion by (1) deciding not to investigate presently the operation and management of the Wyman 4 Generating Plant and (2) failing to remove from rate base one half of the value of Wyman 4 pending completion of an investigation?

(9) Did the PUC abuse its discretion by not excluding from rate base all property held for future use?

We will discuss each of these issues in the order we have stated them.

### 1. The Employee Discount

The Company offers a discount of 33⅓% on base rates to all two thousand of its employees. Having found that the employee discount promotes the consumption of electricity and is, therefore, an unwarranted form of compensation, the PUC ordered the Company to "submit ... a plan to phase out the employee discount by no later than January 1, 1981." Pursuant to 35 M.R.S.A. § 304 and upon motion by the Company, the PUC stayed the above-quoted order pending disposition of this appeal.

The employee discount is incorporated in a collective bargaining agreement covering approximately half of the Company's employees. Pointing to the Supremacy Clause of the United States Constitution and the central position of collective bargaining within the framework of federal labor law, the Company asserts, first, that the PUC is constitutionally forbidden to issue an order trenching on an area occupied by the National Labor Relations Act, and, second, that even if not violative of the federal Constitution, the PUC order nevertheless violates Maine law.

We conclude that the order to submit a plan phasing out the discount does not violate Maine law. However, we set aside the order and remand this facet of the case to the Commission for the taking out of additional evidence and for Commission consideration and determination in light of the analysis that follows.

### A. The Phase-Out Order Under Maine Law

It is clear, at least in the abstract, that the PUC has authority to disallow as an operating expense the amount attributable to the employee discount. *See, e. g., New England Telephone & Telegraph Company v. P. U. C.*, Me., 390 A.2d 8, 56 (1978). Under the recently enacted Electric Rate Reform Act, 35 M.R.S.A. § 91 *et seq.*, it is equally clear that, upon a finding that the discount unjustifiably inhibits energy conservation, the PUC has the authority to order submission of a proposal terminating the discount altogether. Section 93 of the Electric Rate Reform Act in pertinent part provides:

"The [public utilities] commission, *as it determines appropriate, shall order electric public utilities to submit ... programs for implementing energy conservation techniques ...*, either in conjunction with or independently of any rate-making proceeding pending before the commission." (emphasis added) [1]

---

1. Another provision of the Electric Rate Reform Act, 35 M.R.S.A. § 94 (Supp.1980–81) adds in part:

   "[T]o the extent that is feasible, the commission shall consider and adopt the federal rate-making standards established in the United States Public Utility Regulatory Policies Act of 1978 .... [16 U.S.C.A. §§ 2601–2645 (Supp.1981)]."

   The 1978 Public Utility Regulatory Policies Act, or PURPA, was enacted upon a finding that "congressional authority under the Constitution to regulate interstate commerce require[s]—

   (1) a program providing for increased conservation of electric energy, increased efficiency in the use of facilities and resources by electric utilities, and equitable retail rates for electric consumers, ...." 16 U.S.C.A. § 2601.

   As part of the program established by PURPA, Congress required state regulatory commis-

sions to exercise discretion during rate-making proceedings on the question of implementing six enumerated standards designed to further the conservation of electric energy. *Id.*, §§ 2621–2622. Among those standards is one directing that class rates reflect the cost of providing electricity to each class. *Id.*, § 2621(d)(1).

In the instant decision, the PUC explicitly considered the employee discount in the context of the standards and purposes set forth in PURPA, concluding:

   "It costs the same to serve an ordinary residential customer as it does to serve a CMP employee. The Company employee pays less, however. To the extent that residential customers are charged their cost of service, it is clear that the employee is not charged the full cost of rendering service to him. Moreover, to the extent that the discount encourages use of the system peak and generates

■ The Company asserts that its employee discount is expressly permitted under 35 M.R.S.A. § 103, which states *inter alia*: "nor shall it be unlawful for any public utility to make special rates to its employees ...." Section 103 has been in our statutes for decades. *See* R.S.1954, c. 44, § 40. By necessary implication, we think the Electric Rate Reform Act has repealed Section 103 to the extent that that Section would prohibit the PUC from ordering the phase-out of a wasteful, environmentally unsound promotional discount. *See, e. g., State v. London*, 156 Me. 123, 162 A.2d 150 (1960).

■ The Company's primary argument against the PUC's order rests not on statutory but on the case law in Maine, namely, on our 1979 decision in *Central Maine Power Company v. Public Utilities Commission*, Me., 405 A.2d 153 (1979). There, the PUC had disallowed as an expense for ratemaking purposes the same discount presently at issue. As here, the PUC's justification rested largely on the discount's unwarranted promotional effects. Upon review of the record testimony in the 1979 *Central Maine Power* case, we could not find substantial evidence to support the conclusion that the discount promoted electricity consumption. Figures comparing employee with other residential customer consumption were haphazard, ill-defined, and unreliable. 405 A.2d at 176, n. 37. The issue of the discount's promotional effects was "casually injected into the proceedings." *Id.* No full and appropriate contest of the issue was discernible from the record. *Id.* Noting our reluctance to interfere with the understandings reached between a utility and its employees, *id.* at 177, we concluded:

> "Where, as here, the road chosen by management [in the creation of employee compensation packages] is arguably at least as economical as any alternative, and the benefit does not clearly appear to

higher costs, the efficient use of the Company's resources is not encouraged.... Mr. Webb [a Company witness] agreed that the

be '... *unwarranted* ...,' management's judgment must be respected." [citations omitted] (emphasis in original).

"We need not, and do not, decide that the entire spectrum of matters relating to employee compensation is beyond the reach of the Commission's regulatory powers. We have clearly held to the contrary in the past. [citations omitted] *We hold only that we cannot find, in this record, any substantial evidence justifying the Commission's interference with a reasonable managerial judgment.*" 405 A.2d at 178–79 (emphasis added).

In this case, the employee discount issue was not casually injected into the record. Substantial evidence was developed to justify the Commission's conclusions that the discount promoted electricity consumption. In the 1979 case we suggested the need for data comparing usage between employee electric space heating customers and non-employee electric space heating customers. 405 A.2d at 176, n.37. That data, developed here, disclosed that employees consumed 23% more electricity than non-employees. In three related categories, general electricity usage, water heating, and space plus water heating, employees were shown to consume, respectively 25%, 14%, and 17% more electricity than others in the residential class. The Company now challenges the reliability of these figures, which it itself supplied, on the ground that there was *no* showing that non-employees were comparable to employees in every respect that might otherwise explain the latter's electricity consumption—family size, age, and annual income, for example. But the record shows that the discount was originally implemented by the Company in order to *promote* the usage of electricity. The PUC could reasonably infer from this that the promotional purpose remains effective.

Both PURPA, *supra*, n.1, and the Electric Rate Reform Act reflect that it makes little sense to spend the earth's capital as though

discount was not consistent with the objectives of PURPA."

it were income.[2] A discount promoting the use of electrical energy, the generation of which depends on the expenditure of nonrenewable resources, is in this sense both "uneconomical" and "unwarranted." Because substantial evidence supports the PUC's order, this case is plainly distinguishable from the above cited 1979 *Central Maine Power* decision.

### B. The Constitutionality of the Order

■ Having concluded that the challenged order does not violate Maine statutory and case law, we cannot, for the reasons we state *infra*, decide the question whether it violates the federal Constitution.

The collective bargaining agreement in which the employee discount is promised does not expire until May, 1982. Until we understand (1) how quickly the PUC intended the discount to be phased out and (2) in what way, if at all, abolition of the discount affects the current bargaining agreement, we cannot accurately formulate the issue purportedly before us.

On the question of how quickly the discount must be phased out, the PUC's order is ambiguous and the body of the PUC's decision noncommittal. As to how the current agreement might be affected by the PUC's order, the record itself is insufficient.

The Company introduced the collective bargaining agreement in evidence. The agreement provided, in pertinent part:

"The Company agrees that it will not of its own volition, without the consent of the Union, *make any changes during the life of this Agreement in the following General Orders* which would decrease the benefits for employees in the bargaining unit provided therein: . . . " General Order No. 212—"Electric Service Discount" (emphasis added)

General Order 212, which presumably contains all the terms of the employee discount, was not introduced in evidence. So long as "General Order 212" is not in the record, the PUC points out, this Court must remain uncertain whether the Company's promise to leave the General Order alone is or is not conditioned on uninterrupted acceptance of the discount by the PUC. If General Order 212 did condition the Company's promise on the Commission's continued toleration of a discounted employee rate, then the Company would not be violating the collective bargaining agreement in complying with the PUC's order. Similarly, the Company might not be committing a breach if the phrase "not of its own volition", as used to modify the otherwise prohibited activity of unilaterally changing a "General Order", is broad enough to exonerate the Company's obedience to the PUC.

Next to these gaps in the record stands a crucial ambiguity in the order itself. The Commission's order requires the Company "to submit to this Commission a plan to phase out the employee discount by no later than January 1, 1981." In the body of the decision, the PUC declares:

"While only 50% of the Company's employees are affected by the contract, and while the provision relating to the discount can apparently be negotiated at any time, we find that fairness requires some degree of flexibility to allow the Company to extricate itself from its commitments to its employees. Rather than disallow the amount of the discount at this time, we will allow it as an expense but we will order the Company to present us with *a plan for phasing out the discount as expeditiously as possible. We will consider the Company's proposals during Phase II of this proceeding."* (emphasis added)

The deadline specified in the PUC's order, January 1, 1981, appears to fall at or near the beginning of "Phase II of this proceeding." Inferably, therefore, January 1, 1981, is the time by which a plan to phase out the discount was to have been submitted, not the time by which the phase-out itself was to have been accomplished. As to the latter

---

**2.** The metaphor is that of economist E. F. Schumacher. *Small is Beautiful: Economics as if People Mattered* _____ (19___).

event, we are told only that it is meant to occur "as expeditiously as possible." That language does not inform us whether the discount is to be extinguished before or after the expiration of the current bargaining agreement.[3] If, as the Company asserts, the Commission seeks to "rewrite" the current agreement, then the preemption issue might be framed thus: under the circumstances of this case, should the order of a state regulatory agency be allowed to override a contractually agreed upon solution to a problem concerning which the National Labor Relations Act directs both management and union to bargain? If, on the other hand, the PUC was not seeking to "rewrite" the current agreement, but instead was seeking to assure that the employee discount not reappear in any subsequent agreement, then the issue must be posed differently, for example: should the challenged order, which affects non-union as well as union employees, be permitted to narrow the scope of future negotiations upon a mandatory subject of bargaining? Depending on which formulation of the issue is at stake, the considerations to be brought to bear may well be different. *See, e. g., Malone v. White Motor Corp.*, 435 U.S. 497, 98 S.Ct. 1185, 55 L.Ed.2d 443 (1978).

■ The PUC has moved to dismiss the constitutional challenge on the ground that it has been asserted by the Company for the first time on appeal. It is clear, however, that the order to phase out the employee discount was entirely unanticipated below. At no time during the proceedings did any party argue, or the hearing examiner recommend, that the discount be abolished. Instead, argument focused solely on the question of whether the Company's revenue requirements should be reduced by an amount equal to the discount. Fairness demands that we not dismiss the constitutional challenge regarding a matter that the Commission brought forward for the first time by its order and that the Compa-

ny had no reason to anticipate as being involved. The ambiguity of the order and the insufficiency of the record require that we set aside the order and remand to the Commission. The PUC should clarify whether it intended that the employee discount be phased out before or after expiration of the current bargaining agreement, and, if before, additional evidence should be admitted and factual findings made on the exact terms of the discount and the impact of the order as to those terms.

## 2. Rate Base Treatment of the Defective Muffler

The Company owns an oil-fired generating plant, so-called Wyman Unit No. 4, in Yarmouth. The plant came on line in December, 1978. From the outset it was plagued with difficulties. One difficulty involved a poorly designed or installed stack muffler which, because of its excessive noise, the Company was obliged to replace in the autumn of 1979 with a second muffler.

The PUC staff urged that since the original muffler was no longer used or useful its value should be excluded from rate base and its costs amortized over the useful life of the plant. The PUC agreed in part. It excluded from rate base $542,468 and concluded that, because the Company was seeking to recover the defective muffler's costs from the manufacturer, "any allowance for an amortization at this point in time is premature."

Acknowledging that the value of the defective muffler should be excluded from rate base, the Company claims, first, that the PUC erred in its valuation of that muffler and, second, that it is entitled as a matter of law to recover its investment in the defective muffler through amortization. We agree with the Company's first contention but disagree as to the second.

### A. The $542,468 Exclusion

■ *In Re: Central Maine Power Company*, 26 PUR 4th 388, 398 (Me., P.U.C.

---

**3.** The PUC must be deemed to have intended a definite time. Because this Court does not sit to render advisory opinions, we cannot decide, as an abstract legal question, how expeditious is "as expeditiously as possible."

1978), the Commission defined "rate base" as follows:

> "The rate base consists of the investment made by various capital owners of Central Maine in utility plant that is *used or required to be used* in rendering utility service. The suppliers of capital are legally entitled to a reasonable opportunity to earn a fair return on their investment. Thus, the rate base multiplied by the fair rate of return equals the fair [or required] return ... in dollars." (emphasis added)

Apparently, when submitting rate revisions, the Company included in its proposed rate base the original cost of the defective muffler less depreciation, but it did not isolate that cost from the general, plant-wide costs of Wyman 4. The Company also included an additional $542,468, representing the expenditure made by the Company for the replacement muffler during the thirteen month 1979 test-year period. The total capitalized cost to the Company of the replacement muffler is $1,832,470.

Concluding that the defective muffler was useless and finding insufficient record evidence of its cost, the Commission valued the defective muffler at its replacement cost, $1,832,470, and, accordingly, removed $542,468 from rate base.

Both the Company and the PUC apparently concede that, had the original cost of the defective muffler, less depreciation, been isolated as an identifiable figure from the general plant-wide costs of Wyman 4, the Commission could properly have removed that figure from rate base. Clearly, the Commission acted within its discretion in concluding that the Company is not entitled to rate base treatment of both the defective muffler and its replacement.

In effect, however, the Commission's adjustment has left in rate base the unknown original cost, less depreciation, of the use-

less muffler and removed from rate base the test-year portion of the known cost of the used and useful muffler. For at least three reasons, that adjustment was erroneous.

First, the as yet undepreciated cost of the defective muffler and the $542,468 that happened to be invested during the test-year in manufacturing and installing a new muffler are logically incommensurable values.

Second, there is no concrete evidentiary support for the conclusion that the total cost to the Company of purchasing and retrofitting a working muffler into an existing smoke stack, $1,832,470, is substantially equivalent to the original cost of the defective muffler.

Third, in a footnote to its decision, the Commission stated:

> "Since the new muffler is used and useful, the Company is entitled to earn a return on the full value of the new muffler." [4]

This statement cannot be reconciled with the Commission's adjustment. In particular situations involving failed equipment it might be appropriate to depart from test-year expenditures in order to include in rate base the full value of replacement equipment, *see, e. g., Pennsylvania Public Utility Commission v. Philadelphia Electric Company*, 17 P.U.R. 4th 203, 208 (Pa. P.U.C. 1976). Conceivably, this would be such a case. But, not yet, at least, has it been shown that the full value of the new muffler, $1,832,470, did, ultimately, find its way into rate base.

We remand for the Commission to receive evidence on, then to remove, the defective muffler's original cost less depreciation. Additionally, at a minimum, the $542,468 erroneously taken out of rate base should be restored. If the Commission has in fact

---

4. The Commission's footnote reads in its entirety:

> "For purposes of this record, the defective muffler is valued at its replacement cost of $1,832,470, which also represents the cost of the new muffler. For undisclosed reasons, however, the Company has only included $542,468 of the new muffler in rate base. Since the new muffler is used and useful, the Company is entitled to earn a return on the full value of the new muffler. Our adjustment, therefore, leaves in rate base the full cost of the new muffler."

already determined that the Company is entitled to earn a return on $1,832,470, the rates should be adjusted accordingly.

### B. Amortization

■ Even though the Company's capital owners are denied the right to earn a return *on* their investment in the defective muffler through its inclusion in rate base, the Company asserts that they are entitled to a return of their investment through amortization of that muffler's as yet undepreciated cost.

In its decision, the PUC declared:

"While the malfunction of the muffler is not attributable to any imprudence on the part of the Company, we do not find that it is reasonable to allow the Company to recover the cost of the muffler through an allowance for an amortization at this time. ... The record reveals that the Company has taken some steps to secure a settlement with the muffler's manufacturer, Burns and Roe. Since recovery of some or all of the costs may be possible, a balancing of the interests of the ratepayers and shareholders dictates that any allowance for an amortization at this point in time is premature. The Company, however, should keep the Commission informed about the Company's progress in securing settlement during future rate cases."

On the Company's attempts at settlement there is ample record evidence. The Company contends, however, that the above-quoted order improperly interferes with management judgment concerning the advisability of suit. It adds that, in refusing amortization here while allowing amortization of certain expenditures connected with the aborted Sears Island nuclear plant project, PUC policy is impermissibly inconsistent.

The short answer to the latter contention is that in regard to Sears Island the Company was not embarked on an independent effort to recover the expenditures requested. Here, where there is a possibility that the manufacturer may reimburse the Company for the costs of the defective muffler, the PUC could properly take into account the possibility of a double recovery if amortization were allowed at this time.

We do not disagree with the Company that forcing a suit against a manufacturer invades an area properly reserved to management. Nothing, however, in the PUC's decision can be construed as forcing such a suit. The decision merely postpones the question of amortization until the status of any suit or settlement is clarified. The Commission did not thereby abuse its discretion.

### 3. Exclusion from Rate Base of the Richmond and Canco Road Properties

■ The PUC excluded from rate base the Company's $1,573,793 investment in land in Richmond and its $162,655 investment in land on Canco Road, Portland. Neither of these properties is presently used and, according to the PUC, neither is "required to be used" within the meaning of 35 M.R.S.A. § 52.

In *Re Central Maine Power Company*, 26 PUR 4th 388 (Me., P.U.C.1978), the Commission put the Company on notice that no land will be deemed eligible for inclusion in rate base as property "used or required to be used in ... service to the public", 35 M.R.S.A. § 52, unless the Company affirmatively demonstrates the existence of a "definite plan" for future use:

"In future rate cases, ... utilities must bear the burden of justifying the inclusion in rate base of property held for future use by demonstrating that *a sufficiently definite plan exists for the use of such property.*" 26 PUR 4th at 400–01 (emphasis added).

Both before the Commission and in this appeal, the Company has challenged the reasonableness of the "definite plan" standard. In the Company's view, that standard punishes the prudent acquisition of alternative generating sites; it overlooks that long lead-times in planning are necessary, since unforeseen obstacles can stymie current plans and rising land costs can render deferred acquisitions prohibitive.

When the PUC first expressly adopted the definite plan standard, it explained: "[W]e cannot burden ratepayers for an indefinite period with paying a return on company assets which confer no immediate benefit on and provide no guarantee of future benefit to Central Maine's ratepayers." 26 PUR 4th at 400. In the instant order, the PUC has reaffirmed its adoption of the standard, noting that the above-quoted rationale "remain[s] as viable today as when first enunciated." Other Commissions support the PUC's position. *E.g. Pennsylvania Public Utilities Commission v. West Pennsylvania Power Company*, 32 PUR 4th 245 (Pa.P.U.C.1979); *Re Central Vermont Public Service Corporation*, 28 PUR 4th 469 (Vt.P.S.B.1978). As a rational compromise between automatically including and automatically excluding all property held for future use and, more importantly, as a workable interpretation of the statutory concept "property . . . required to be used", the definite plan test for rate base treatment is a reasonable exercise of PUC discretion.

The Company next contends that both the Richmond and Canco Road properties *were* subject to "definite plans" and therefore should not have been excluded from rate base. This question is one of fact, the Commission's answer to which must be affirmed if supported by substantial evidence. *See e. g., Casco Bay Lines v. Public Utilities Commission*, Me., 390 A.2d 483 (1978).

According to Mr. Howe, a Company witness, the plan for the Richmond land is no more definite at present than it was when the PUC last excluded that land from rate base. 26 PUR 4th 388 (1978). Richmond is contemplated as an alternative site to a coal plant at Sears Island; the latter is still being actively pursued. In the event that the Sears Island plant is constructed, Richmond is nevertheless expected to be necessary for projected 1994 consumption. But it's "still up in the air", according to Mr. Howe, what kind of generating facility will be built. The Richmond plant's capacity and the beginning construction date are

also up in the air. Neither federal nor state licenses have been applied for; preliminary environmental studies were not known to have been undertaken. Mr. Howe conceded at the end of his testimony that he could not truly say whether a plant "will actually be built" in Richmond. The PUC was not clearly erroneous in concluding that the Company had failed to carry its burden of showing the existence of a definite plan.

Regarding Canco Road, the PUC's decree states:

"Unlike [the Richmond property] . . . where it is not even clear that any plan even exists . . . , here the Company apparently has at least decided what use to make of the Canco Road property. It is the definiteness of that use which is at issue. Based on this record we cannot conclude that the property will definitely be used."

A service building housing clerical employees is presently located on Canco Road. That building is projected to expand in "1985, on or about." This projection may have been made five years ago, although Mr. Howe was uncertain. In the meantime, presumably, the Company purchased new data entry systems. Mr. Howe agreed that these purchases would "possibly" preclude the need for additional expansion. On the above record, the PUC concluded that the Company had not carried its burden of proof, a conclusion which is rationally supportable and therefore, will not be disturbed on appeal.

### 4. The Rate at Which AFUDC Should Be Capitalized

In 1978, this Court decided that the election to capitalize AFUDC at either a "gross" or a "net rate" is within the sound discretion of the PUC. *Central Maine Power Company v. Public Utilities Commission*, Me., 382 A.2d 302, 321 (1978). We thereby affirmed, over the Company's challenge, the PUC's longstanding practice of choosing the gross rate. *See e. g., Re: Central Maine Power Company*, 15 PUR 4th 455, 471–72 (Me.P.U.C.1976). In this appeal, the Company once again attacks that practice,

claiming that the PUC abused its discretion by electing, contrary to the testimony of its own as well as a Company witness, not to employ a net rate.

■ AFUDC, or "Allowance for Funds Used During Construction", is the cost of capital expended on "construction work in progress" (CWIP). For purposes of analysis, the cost of capital, which resembles other construction related costs such as wages and purchases, may be said to have two components. The first, an interest component, would be explicit interest on borrowed funds. The second, an equity component, would be the return that is "foregone" when capital passes into ongoing construction work rather than into alternative investments.

■ According to Staff witness Bruce Louiselle, when a utility plant is not yet in service, wages, purchases, and all other costs of CWIP—with the notable exception of AFUDC—are not included by the Company as current expenses in its test-year income statement. Rather, they are capitalized, prorated over the useful life of the plant under construction, and ultimately recovered from future ratepayers by means of depreciation expenses.[5] AFUDC, by contrast, does appear in the test-year income statement. Although booked by accounting convention as "other income", AFUDC generates savings on income tax as a current expense.

For rate-making purposes, the Commission has consistently treated the AFUDC accrued over the given test-year as "income", not as "expense." AFUDC thus offsets CWIP, which the PUC adds to rate base. (Rate base, again, consists of capital owners' investment in property used or required to be used in utility service; when rate base is multiplied by the fair rate of return, it gives the required return in dollars). So long as AFUDC is itself capitalized at the fair rate of return, the "gross rate", the return required by virtue of CWIP's inclusion in rate base, is effectively

offset by the return "earned" by virtue of AFUDC's inclusion in income. Construction work in progress, consequently, does not generate a rate increase. If, however, the above-mentioned tax savings attributable to the interest component of AFUDC are "netted out" of the fair rate of return and AFUDC is capitalized at this lesser "net rate", the return required becomes greater than the return "earned", and construction work in progress can generate need of a rate increase.

In practical effect, therefore, the PUC's decision to capitalize AFUDC at a gross rate "flows through" to current ratepayers the benefits of the Company's current tax savings. In *Central Maine Power v. Public Utilities Commission*, Me., 382 A.2d 302, 319–20 (1978), the Company argued against the reasonableness of this flow-through. The Company does not renew those arguments in this appeal. Instead, its contentions rest entirely on the alleged impact of the "gross rate" on its financial integrity, that is, on the Company's future bond ratings and ability to attract capital. When the effects of "attrition", or the tendency of inflation to diminish the actual rate of return, are added to the effects of use of the gross rate, the PUC's handling of the AFUDC issue concededly reduces the Company's revenue requirements by some $5,500,000.

Staff witness Bruce Louiselle conducted an exhaustive study of the impact of the "gross" versus the "net" rate on the Company's financial integrity. In so doing, Louiselle made use of a Company-supplied 1980–1990 construction schedule. The schedule included projected expenditures for the planned coal-fueled generating facility on Sears Island. Basing one set of calculations on the assumption that Sears Island would be built as scheduled and another set of calculations on the opposite assumption, Louiselle concluded:

"In my view ... [the results of my study] indicate that CMP can finance its

5. It has been the PUC's view that "consumers who should pay for the cost of generating facilities are those customers who are served by

those facilities." *Re Central Maine Power Company*, 26 PUR 4th 388, 402 (Me.P.U.C. 1978).

construction program, including Sears Island, on reasonable terms were it required to capitalize AFUDC at a net rate. *Were Sears Island not to be constructed and not replaced by another project*, CMP could finance its program on reasonable terms were it required to capitalize AFUDC at a gross rate." (emphasis added).

In opting against the net rate, the PUC is its decree described Louiselle's study, quoted his conclusions, and then noted:

"[The Staff] takes the position that the 'gross' AFUDC rate should be used because at this time it is unclear whether Sears Island (or some other project) will be undertaken. The Staff thus urges that 'the Commission should not at present make a blind guess as to the future of the Sears Island Coal Plant and should therefore continue its present practice [of using the gross AFUDC rate] until that future is ascertained.' "

"The Commission agrees with the staff on this point . . . ."

Relying on the above-quoted portion of Louiselle's testimony, the Company argues in this appeal that the PUC's continuing use of the gross rate unreasonably *assumes* that no new generating capacity will be needed.[6] The Commission counters that its order assumes no such thing. The order merely finds that existing uncertainties surrounding Sears Island and the need for new capacity warrant no change as yet in past practice. By the time of the next rate proceeding—when, presumably, the Company's now pending petition to construct the Sears Island plant will have been decided and its load forecast and proposed construction schedule will therein have been reviewed—a change to a net capitalization rate may be in order. But such a change, for the present, would be irresponsible.

**6.** CMP also attempts to outline, by means of evidence not in the record, what would happen to Company financing if Sears Island is not built and equivalent replacement power has to be obtained. The PUC properly points out that (1) this Court does not serve as an original forum to find facts, and (2) the "facts" as thus set forth by the Company appear inherently unreliable.

After carefully reviewing the record, we conclude that the Commission's decision to continue its past practice of capitalizing AFUDC at the gross rate was well within its discretion. At bottom, that decision rests on the Commission's factual finding that "a shift [from gross to net capitalization rate] *is not now essential to the Company's financial integrity.*" (emphasis added). Support for this finding lies in the testimony of Dr. Ileo, consultant to intervenor Bath Iron Works, who stated:

"In my opinion, the only time a utility should be permitted to earn a return on CWIP projects is when it is determined that the utility will repeatedly suffer cash flow problems. My analysis of CMP'S cash flow position indicates that it has no such problem."

Support also lies in the testimony of Louiselle himself. Louiselle's study determined that if the PUC continues to capitalize AFUDC at the gross rate, Company debt coverage would fall below minimum indenture requirements by 1985. But Louiselle readily admitted that another rate proceeding was likely before 1985. He assumed for purposes of his recommendations that construction would proceed according to the Company-supplied 1980–90 program. But he admitted that utilities in the past had often overestimated their load forecasts, and he noted the reasonableness of the Company's construction program, the likelihood that it would proceed on schedule, and that the accuracy of the expenditures it proposed had not been examined by him. Finally, Louiselle stated that

"as a matter of principle AFUDC should be based on the fair rate of return, except in extraordinary circumstances."[7]

**7.** Louiselle explained:
  "It is my opinion that, generally, it is preferable to flow these benefits through to the consumer in the year incurred. Conceptually, tax deductions have value only if there is revenue against which they can be offset. Since it is current customers who provide that revenue, it is current customers who give rise to the value of these interest deductions; therefore, they should receive the ben-

The PUC staff, obviously, was unwilling to assume the existence of "extraordinary circumstances" until it had had full opportunity to review the need for new capacity in the context of the pending Sears Island certification petition. On this record, the Staff position was clearly justified, and it was not error for the Commission to adopt it. *See Central Maine Power Company v. P.U.C., supra,* 405 A.2d at 185–86. *See also Central Maine Power Company v. P.U.C.,* Me., 414 A.2d 1217, 1232 (1980).

### 5. Amortization of Pre-Certification Sears Island AFUDC Capital Costs

On January 25, 1977, the Company cancelled its plan to build a nuclear power plant on Sears Island. The primary reason for the cancellation was the discovery of an earthquake fault within 2000 feet of the proposed site. Prior to the discovery of the fault the Company had spent over $2,000,-000 in preliminary engineering studies needed for future licensing and, in addition, several million dollars in prepayments under a uranium contract with the federal government. While the instant PUC decision was pending, the Company sold the uranium contract for a net payment of $3,534,180.

The PUC found that these expenditures were not imprudent. Citing, *inter alia, Re Virginia Electric and Power Company,* 29 PUR 4th 65 (Va.S.C.C.1979), the Commission concluded that since the plant had never become used and useful, the most equitable method of allocating the expenditures was to allow Company shareholders a return *of* their investment (through amortization and depreciation) but not *on* their investment (through inclusion of the unamortized balance in rate base). Accordingly, the PUC authorized the Company to amortize over a five year period the expenses of the preliminary engineering studies. The Company was not allowed, however, to amortize over $300,000 of associated AFUDC. So far as prepayments on the uranium contract were concerned, the PUC advised the Company that it could request an appropriate allowance at its next rate filing should any portion of the prepayments remain unrecovered following that contract's sale. The PUC added, however, that it would not permit amortization of the approximately $500,000 of AFUDC connected to those prepayments. In thus distributing between ratepayers and shareholders the costs of the risk that an anticipated project will not be completed, the PUC explained in its decree:

"When a plant becomes used and useful, the shareholder is ordinarily rewarded for his risk by being allowed both a return of AFUDC, through depreciation, and on AFUDC, when it is capitalized and included in rate base. The AFUDC amounts in the present case, however, represent the carrying costs borne by the investor of a project which will never become used and useful. While we recognize that the shareholders have, in the present case, been shouldering all carrying costs so far, a reasonable balancing of the burden of this abandoned project requires that the shareholders continue to do so."

In this appeal, the Company charges that the PUC did not engage in "reasonable balancing." According to the Company, any distinction between pre-certification capital costs, or AFUDC, and all other pre-certification costs is illogical and, when effectuated, "confiscatory."

The PUC relied in its decree upon *Re San Diego Gas and Electric. Co.,* 31 PUR 4th 435 (Cal.P.U.C.1979), where the same distinction was identically reasoned and similarly effectuated. *See id.* at 447, 449. In *San Diego* the utility had accumulated nearly $90,000,000 in site-related and non site-related pre-certification costs prior to abandoning its plan to build a nuclear plant. Before permitting investor recovery of any of these costs, the California Commission first separated out and "discarded" all

---

efit. When the tax benefits are not flowed through, and thus deferred, such benefits would continue to accumulate in increasing amounts assuming that CWIP continues to increase. Under such conditions of deferral the consumer would never realize fully these tax benefits."

AFUDC. The Company attempts to distinguish *San Diego* by suggesting that only where costs are of such magnitude is non-recovery of AFUDC justifiable. We discern no plausible basis for the suggested distinction, and we reject it.

The Company also avers that the PUC's position is inconsistent with past practice. To establish this inconsistency, the Company points only to *Bangor Hydro-Electric Company Re: Proposed Increase In Rates*, Docket No. 80–38. The utility in that case requested and obtained amortization of all pre-certification expenses, including AFUDC. The decision was based, however, not on a hearing and adjudication but on a stipulation agreement among the parties. As the PUC points out, accepting a stipulation as a "fair and complete resolution of all issues" is not tantamount to a holding that the resolution is the *only* fair and complete one possible. In the approval of stipulation agreements, fairness is not the Commission's only concern. It must also be mindful of the delay and expense involved in the full hearing process that all parties are seeking to avoid by stipulating to a resolution. The one case cited by the Company that involved reversible inconsistencies by a public utilities commission, *Boston Gas Co. v. Department of Public Utilities*, 367 Mass. 92, 324 N.E.2d 372 (1975), was premised upon unjustified inconsistent prior decisions, not upon a single inconsistent stipulation.

### 6. *Fuel and the Working Capital Allowance*

The Company requested $2,217,715 working capital for a category of expense denominated "fuel for generation" and another $11,663,578 working capital for a separate category called "fuel inventory." On the recommendation of Staff witness Bruce Louiselle, the Commission reduced the $11,663,578 request by approximately $1,943,578. The Company contests that reduction.

■ "Working capital" represents the money provided by Company *investors* to meet day-to-day delivery of utility service. *Re Continental Telephone Company of Maine*, 18 PUR 4th 636, 643 (Me.P.U.C. 1977). It is included in rate base, upon which a reasonable rate of return must be allowed, when it is clear the Company is being forced to provide cash from its own funds to meet necessary expenses. *Central Maine Power Company v. Public Utilities Commission*, 156 Me. 295, 335, 163 A.2d 762, 784 (1960).

■ The issue of what working capital allowance is here appropriate for fuel arises out of the combined testimony of Staff witness Bruce Louiselle and Company witness Douglas Stevenson. Both witnesses were in agreement that between the time electricity is provided and the time it is paid for by the consumer there is a lag, on average, of 45 days, the so-called "revenue lag." Mr. Stevenson found that the vendor-financing period—that is, the period from the time fuel is delivered to the Company to the time the Company pays for the fuel—is on average 17.1 days. Subtracting 17.1 from 45, Mr. Stevenson computed a net revenue lag of 27.9 days. For 27.9 days, according to Mr. Stevenson, the Company is forced to finance the fuel cost of electricity generation itself and therefore requires a working capital allowance. The Company's $2,217,715 working capital request for "fuel for generation" accordingly reflects this 27.9 day revenue lag. The Company's $11,663,578 working capital request for "fuel inventory", on the other hand, appears from the record to be an unadjusted thirteen month test-year average of the "per books" monthly balance of fuel inventory.

Staff witness Louiselle did not disagree that 27.9 days is a proper revenue lag figure for the "fuel for generation" request; he appears to have adopted it in his own lead-lag study. In addition, however, Louiselle made an adjustment to the Company's "fuel inventory" working capital request. He explained that:

"unlike other expenses, oil first goes into inventory, a balance sheet account, before it becomes an expense. Given this lag in payment, a portion of the inventory amount is continually unpaid for, i. e. financed by vendors and not investors.

... Mr. Stevenson indicates that fuel oil is paid for approximately 10 days after the documentation is received. Assuming a 60-day supply of fuel on hand in inventory [60 days being conceded by both parties], a 10-day payment lag would mean that one sixth or 16.67% of fuel oil inventory is vendor financed on a continual basis. I have reduced the per books average of fuel oil inventory by 16.67%."

The Company argues on appeal that there can be only one vendor financing period; that that period is either 17.1 days or it is 10 days, but it cannot be both; and to adopt Mr. Stevenson's 27.9 day revenue lag for "fuel for generation" and, in addition, to reduce the per books "fuel inventory" by one-sixth was unjustified.

The Commission observed in its decision that the Company's contentions "may be correct." Nevertheless, because the Company did not in a rebuttal case introduce affirmative evidence showing *how* Mr. Louiselle's adjustment to fuel inventory was mistaken, the Commission rejected the Company's position on the ground it had failed to carry its burden of proof. *See* 35 M.R.S.A. §§ 69, 307.

The record raises too many questions for us to affirm the Commission's decision. We will therefore remand for the taking of additional evidence in accordance with the following guidelines.

The Company on remand should explain to the Commission why, for purposes of requesting working capital, it asked for $2,217,715 under the heading "fuel for generation" and another $11,663,578 under the heading "fuel inventory." On the record before us the Company's basis for erecting two *separate* categories of fuel expense is not at all clear. If, as the Company asserts, "fuel inventory" requires no vendor financing adjustment so long as "fuel for genera-

tion" has been adjusted for vendor financing, the Company should define what is embraced by the category "fuel for generation"; from the nature of the utility's function, it is tempting to assume that fuel inventory *is* fuel for generation, and *vice versa*.

Second, the Company should be more explicit regarding its methods of fuel accounting. We cannot tell from this record, for example, what the parties mean when they assert that fuel is "expensed" when burned. The 45-day "revenue lag" computed by Mr. Stevenson appears to run from the day a particular quantum of electricity is provided by the Company to the day the Company receives consumer payment for it. Presumably, the day a particular quantum of electricity is provided is the same day on which the Company burns the fuel that generates that electricity. Given (1) Mr. Stevenson's characterization of an "expense lag" as "the average interval between the date that expenses were incurred [by the Company] and the date Company funds were disbursed" to pay for those expenses, and (2) Mr. Stevenson's assertion that the Company's net working capital requirement equals its "revenue lag" less its "expense lag", the Company should clarify, within the meaning of this definition, whether or not fuel expenses are "incurred" on the day that fuel is burned. If fuel expenses are "incurred" earlier—*e. g.*, on the day of fuel delivery or at the time documentation of delivery is received—then the Company should explain why, at least in the case of fuel, its "revenue lag" should not begin to run as of that earlier date. Obviously, if Mr. Stevenson's "expense lag" of 17.1 days were to be subtracted from a "revenue lag" greater than 45 days, then the Company's net working capital requirement on "fuel for generation" could hardly be as large as the Company presently insists.[8]

---

**8.** We note in passing that the 10-day vendor financing adjustment to "fuel inventory" recommended by Staff witness Bruce Louiselle was explicitly based on the average interval elapsing between receipt of the papers *documenting* a fuel delivery and the Company's payment for the fuel. Douglas Stevenson's

17.1 day adjustment to "fuel for generation" was presumably based on the necessarily longer interval that runs from the physical delivery of the fuel itself. If the Commission should again choose to accept the Louiselle adjustment, we would want an explanation of why a 10-day adjustment is appropriate for "fuel in-

Third, and finally, the record leaves us uncertain whether the Company is seeking to receive rate reimbursement of fuel costs that the legislature has separately provided for under the fuel adjustment provision, 35 M.R.S.A. § 131 (Supp.1980–81). *See Central Maine Power Company v. Public Utilities Commission*, Me., 414 A.2d 1217, 1226–29 (1980). On remand, this point should be clarified.

### 7. The Residential Customer Charge and "Phase II" of the Proceeding

In 1978, the PUC changed the Company's residential energy charge from a "declining block" to a "flat" rate.[9] In conjunction with that change, the PUC also raised the minimum residential customer charge from $3.40 to $5.70. *Re Central Maine Power Company*, 26 PUR 4th 388, 425–29 (Me.P.U.C.1978). Included in the increased minimum customer charge were the Company's minimum distribution costs.[10]

In 1979, the Legislature supplemented the Electric Rate Reform Act, 35 M.R.S.A. § 91 *et seq.*, with a new provision, 35 M.R.S.A. § 96. Section 96 declares:

"The Public Utilities Commission, *in approving any minimum customer charge in an electric utility rate proceeding subsequent to the effective date of this section* [Sept. 14, 1979], *shall consider whether the exclusion of any minimum distribution costs* incurred by the utility from such customer charge may be reasonably expected to advance the basic findings and purposes of this chapter. If the commission so finds, it shall exclude from the customer charge any minimum distribution charges which do not advance the basic findings and purposes of this chapter." P.L.1979, c. 539 (emphasis added).

The "basic findings" of the Electric Rate Reform Act are that improvements in rate design potentially can reduce cost of service, promote energy conservation, and encourage efficient use of existing plants. 35 M.R.S.A. § 92.

Two months after the Company filed in this case under 35 M.R.S.A. § 64 for permission to increase rates, the PUC initiated an investigation, pursuant to 35 M.R.S.A. § 296, into rate design and the Company's cost of service. Docketing the former as No. 80–25 and the latter as No. 80–66, the PUC consolidated them by order of April 2, 1980. Upon consolidation, it then bifurcated the proceeding for purposes of hearing into two phases. Revenue requirement issues were heard in Phase I. The PUC's decision on those issues is presently on appeal. Issues dealing with rate design and cost of service, including the minimum distribution issue, were deferred to Phase II, which presumably began shortly after the Commission's October 31, 1980, decision in Phase I.

The Maine Committee for Utility Rate Reform, an intervenor below, now claims that the PUC impermissibly "ducked" the clear mandate of the above-quoted Section 96 by postponing consideration of whether minimum distribution costs should be excluded from the $5.70 customer charge. Both the charge and the charge's inclusion of minimum distribution costs have been perpetuated by the order in Phase I. The Rate Reform Committee objected to postponement before the PUC handed down its Phase I decision.

According to the Committee, the purported consolidation and bifurcation of what are and remain essentially two proceedings is unwarranted. Because the Company's Section 64 filing on February 1, 1980, was in fact an "electric utility rate proceeding subsequent to the effective date" of 35 M.R.S.A. § 96, *id.*, the PUC had no choice but to heed Section 96's mandate immediately.

---

ventory" but a 17.1 day adjustment is necessary for "fuel for generation."

**9.** With a "declining block" rate, the price per kilowatt hour decreases as consumption increases. With a "flat" rate, that price remains uniform. *See generally, Central Maine Power*

*Company v. P.U.C.*, Me., 382 A.2d 302, 327–28 (1978).

**10.** For a discussion of the nature of the Company's minimum distribution costs, *see Central Maine Power Company v. P.U.C.*, Me., 405 A.2d 153, 187–91 (1979).

Despite this Court's previous observations that rate design issues are of secondary importance to a utility's revenue needs, *see e. g., Central Maine Power Company v. P.U.C.*, Me., 416 A.2d 1240, 1250 (1980), the legislative intent behind Section 96 was, according to the Committee, to put "the minimum distribution issue on a par with revenue requirements", thereby conferring on the former a first priority status.

The PUC responds with a threefold argument. First, it cites the well-established principle that, unless clearly erroneous, an agency's interpretation of a statute the agency is required to enforce is entitled to deference. *E. g., Kelly v. Halperin*, Me., 390 A.2d 1078 (1978). Next, it notes that the present minimum customer charge is intimately related not just to minimum distribution costs but to overall costs of service, *see e. g., Central Maine Power Company v. Public Utilities Commission*, Me., 405 A.2d 153, 188–189 (1979); that consideration of overall costs of service in the context of rate design is mandated both by PURPA and by Maine's Electric Rate Reform Act, of which Section 96 is a part; that deferring Section 96 issues, therefore, to a phase of the proceeding in which PURPA and the rest of the Rate Reform Act will predominate is not only appropriate but also necessary. Third, the PUC argues that the Phase I decision did not in fact "approve" the customer charge within the meaning of that word as used in Section 96; it merely perpetuated *pro tempore* the status quo until the customer charge could be reviewed in Phase II.

We find it unnecessary to discuss these arguments. The reason is that after the oral argument in this case the Legislature acted to repeal the above-quoted Section 96. By P.L.1981, c. 457, enacted June 12, the $5.70 residential customer charge has been eliminated. In its place, the Company will be allowed to recover its costs of customer service, including, apparently, its minimum distribution costs, through a minimum charge incorporated into its flat rate. Chapter 457 provides in pertinent part:

"*35 MRSA § 96*, as enacted by PL 1979, c. 539, is repealed and the following enacted in its place:

"*§ 96.  Minimum charge*

"1.  Companies required to provide minimum charge.  Any electric company serving more than 5,000 customers which has in effect for residential customers a flat rate combining energy and demand charges shall recover its customer costs through the same rate.  As part of that rate, each such electric company shall provide for a minimum charge to include such an amount of kilowatt hours as the commission shall determine."

Chapter 457 will become effective in early September, 1981, 90 days from date of enactment.  The PUC is required by section (2) of that Chapter to order that the new minimum charge be instituted by the Company no later than 30 days after the law's effective date.  Thus, by no later than early October, a separate $5.70 residential customer charge will, at least so far as the Company is concerned, be a thing of the past.

Were we to decide that the PUC erred in postponing a decision on the question of whether to exclude minimum distribution costs from the $5.70 residential customer charge, the Rate Reform Committee asks that this portion of the case be remanded for expedited hearings.  Specifically, we are asked to order the PUC to reach a decision within 90 days of receipt of our mandate.  Little could be gained by such an order even if we were to rule in the Rate Reform Committee's favor;  within 90 days of receipt of our mandate, the old law will have disappeared and the new become effective.

We therefore refrain from deciding this issue.

8.  *Failure to Investigate Wyman No. 4 Presently and Refusal to Exclude One Half of Wyman Pending Completion of Such Investigation*

During the test year, 1979, the Wyman No. 4 Plant in Yarmouth had to be shut down several times for various reasons. One of those reasons, as already discussed,

concerned a defective stack muffler. The longest shut-down, from January 16, 1979, to April 3, 1979, was caused by saltwater leaking through a condenser and contaminating the plant's feed-water system. Largely because the leak went undiscovered for approximately ten hours, damage to the plant was substantial. The PUC found that the Company's operation of Wyman No. 4 in the hours leading up to and during the appearance of the leak was "imprudent." Accordingly, it disallowed from rate base the capitalized test-year amounts of the resulting repairs.

In what the Rate Reform Committee suggests is a related event, the New England Power Pool, of which the Company is a member, changed the use anticipated for Wyman No. 4. The plant was downgraded from an intermediate base load unit, which generally operated at somewhat over 50% of capacity, to an intermediate peaking unit, which is designed to operate only at times of peak demand or about 25% of capacity. The Company related this change not to the leak in the condenser, but to the high cost of relatively low-polluting low sulphur oil. No evidence was produced to controvert Company testimony.

The Rate Reform Committee requested the PUC, and now requests this Court to order the PUC, (1) to investigate immediately, pursuant to 35 M.R.S.A. § 296, the alleged interrelationship between the damage caused by the condenser leak and the change in status from base to peaking facility, and (2) to remove half the entire investment in Wyman No. 4 from rate base pending completion of that investigation.

In its decree, the PUC declared:

"While the plant experienced a great deal of down time during its first year of operation, we do not consider that the plant was no longer used and useful. *See Public Utility Commission v. Metropolitan Edison Co.*, 29 PUR 4th 502, 506 (Pa.Pub.Util.Com'n.1979). We, therefore, do not find any justification for excluding any other portions of the plant [besides repair expenses] from rate base.

"Nor do we make any adjustment based on the dispatch change. While it is true that Wyman Four's original use was intended to be as an intermediate base load plant, we do not find on this record any concrete evidence that the Company's actions in building the plant and having it go on line in December, 1978 were imprudent. The Commission, however, will continue to review the plant's operation during future rate cases."

Earlier, the PUC had stated:

"[W]e find that it is not appropriate to exclude one-half of Wyman Four from rate base and we conclude that further investigation of the dispatch change and of the events surrounding the condenser leak of January 15, 1979, is not warranted at this time."

Even if the Committee's concerns over the vicissitudes of Wyman No. 4 are understandable, we nevertheless find no error in the Commission's decision. A change in a plant's anticipated use, *e. g., Re Detroit Edison Co.*, 35 PUR 4th 429, 439 (Mich.P.S.C.1980), or repeated shut-downs of a plant during its test-year, *e. g., City of Cleveland v. Public Utilities Commission of Ohio*, 63 Ohio St.2d 62, 406 N.E.2d 1370 (1980), are not *per se* grounds for removing all or part of a plant from rate base. Where the PUC did find imprudence, it did not hesitate to adjust rate base accordingly. But as the decision in *Public Utility Commission v. Metropolitan Edison Co., supra*, implies, the relevant inquiry for further rate base adjustments is whether the plant will be used and useful over the time the rates are in effect. The record fully supports the conclusion that despite the dispatch change, Wyman 4 is and will remain used and useful. The evidence was uncontradicted that, at the time of the hearing in this proceeding, there existed no difference between the plant's actual operational capacity and its design capabilities. Before the January 15 condenser leak, the plant had been engineered to be capable of generating approximately 600 megawatts of electricity. Since January 15, it has been called upon to generate, and has repeatedly proven capable of generating, at that magni-

tude. Similarly, the evidence showed that according to the Company's "own-load dispatch" forecasts—that is, according to the anticipated operation of CMP generating facilities in the event the Company were unable to draw upon the NEPAX pool to meet its power requirements—Wyman 4 would be run at up to 50% of capacity.

■ This evidence tends to refute any suggestion that the condenser leak resulted in permanent damage to the plant. The Commission did not abuse its discretion, therefore, in refusing at this time to undertake a formal investigation of the alleged interrelationship between the change in dispatch and the leak.

*9. Exclusion from Rate Base of All Property Held for Future Use*

■ The Company attacked the "definite plan" standard for inclusion in rate base of land held for future use by asserting that, so long as such property was purchased prudently and in good faith, all of it should be included in rate base. The Rate Reform Committee takes exactly the opposite position, contending that until property is used and useful in providing electricity, shareholders alone should bear the burden of its acquisition.

The Committee's concern centers primarily upon the purchase of land on Sears Island for use in constructing a coal-fired plant. Because the Company has a petition to construct that plant presently pending before the PUC, it cannot be said with certainty that the facility will ever be built. Until the hearings in the instant proceeding, the Company held an option on the Sears Island land. During the hearings it exercised that option and immediately proposed to include in rate base that portion of the total purchase price that represents the Company's anticipated ownership in the completed plant. The PUC allowed this inclusion, basing its decision on the existence of a definite plan. It explained in part:

"The Staff does not object to the inclusion of the lease payment but contends that there is no definite plan to justify inclusion of the cost of the purchased land. The definiteness of the Company's plan to use the land at Sears Island does not vary, however, depending on whether the Company owns the land outright or makes payments under an option. The Company has sought reconsideration of this Commission's original rejection of the proposal to build Sears Island and hearings are now underway. *Regardless of the outcome of that proceeding, it is clear at this point that a definite plan exists.*" (emphasis added).

The Rate Reform Committee claims that when the legislature mandated inclusion in rate base of property that is "used or required to be used in ... service to the public", the legislature meant to include *only* property that is used and useful in such service. We agree with the PUC that, if this had been the legislature's intent, there would have been no need for use of the disjunctive "or" in the phrase "used *or* required to be used." *See* 35 M.R.S.A. § 52.

The Committee also cites a number of jurisdictions that have excluded from rate base all property held for future use. *E. g., Re Utah Power and Light Co.,* 29 PUR 4th 399, 403 (Idaho P.U.C.1979); *Re Southwestern Bell Telephone Co.,* 28 PUR 4th 519, 528 (Kan.S.C.C.1979). The PUC notes that, other jurisdictions, claimed by it to be the majority, approve and employ a "definite plan" standard. *See, e. g., Re Southwestern Public Service Co.,* 27 PUR 4th 302, 305–07 (N.M.P.S.C.1978); *Pennsylvania Public Utilities Commission v. West Pennsylvania Power Co., supra; Re Central Vermont Public Service Corp., supra.*

■ The Committee's last contention is that inclusion in rate base of *some* properties held for future use is impermissibly inconsistent with the PUC's treatment of AFUDC/CWIP. Whereas the Commission insists on capitalizing AFUDC at the "gross rate" in order to assure that a return on plants under construction will be provided only by the ratepayers benefitting from those plants, the Commission is content, the Committee argues, to let current ratepayers

pay for land that may never redound to their benefit.

■ As we have frequently observed, the legislature has vested the PUC with the authority and obligation to exercise its expertise and skill in the setting of "just and reasonable rates." *See, e. g., New England Telephone & Telegraph Company v. P. U. C., supra,* 390 A.2d at 48. In undertaking to fulfill that obligation, the Commission need not have a consistent theoretical rationale in its disposition of various problems arising in *different* contexts. As a matter of practical regulation, the Commission's disposition in one context may be reasonable and acceptable even though the theory underlying it may not be consistent with what has been done, and reasonably so, in another context. Here, the very presence of the Company's and the Committee's conflicting positions over the issue of treatment of land held for future use tends to show the reasonableness of the definite plan standard. The PUC has argued that the standard

> "recognizes both the need of utilities to acquire property in advance of its in-service date and the need of ratepayers to pay a return only on that property from which they have a reasonable guarantee of receiving service."

We agree. The standard lies well within the PUC's discretion.

The entry shall be:

(1) The Section 303 appeal and cross-appeal of the intervenor are denied.

(2) The Section 303 appeal and the Section 305 complaint of the Company are *sustained in that part* raising the issues whether (a) the PUC's ordering a phasing out of the employee discount violates the federal Constitution, (b) the PUC's removing from rate base a defective muffler at replacement cost instead of at original cost less depreciation is supportable, and (c) the PUC's manner of reducing the Company's working capital requirement by fuel inventory is supportable.

As to said issues, the case is remanded to the Commission for further proceed-

ings in accordance with the opinion herein.

(3) The Section 303 appeal and the Section 305 complaint of the Company are *denied in that part* raising issues other than those referred to in item (2) of this order of entry.

All concurring.